[Cite as *State v. Nicholson*, 2022-Ohio-2037.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 110595 |
| v. | : | |
| ONAJE NICHOLSON, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED
IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** June 16, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-644528-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John Farley Hirschauer, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant Onaje Nicholson ("Onaje") appeals his convictions following a jury trial. Onaje was convicted of one count of participating in a criminal gang, eight counts of felonious assault, two counts of discharging a

firearm at or into a habitation, one count of discharging a firearm on or near prohibited premises and three counts of failure to comply with an order or signal of police officer, along with various one-year and three-year firearm specifications, based on acts he committed when he was a juvenile.

{¶ 2} Onaje contends that the juvenile court (1) erred in finding probable cause and initially transferring the case to the general division pursuant to R.C. 2152.12(A)(1)(a)(i) and (2) abused its discretion in later determining, in a reverse bindover proceeding conducted pursuant to R.C. 2152.121, that he was not amenable to care or rehabilitation within the juvenile system. Onaje also contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence and that the trial court erred in (1) overruling his objections to the state's use of a peremptory challenge to excuse an African American juror, (2) admitting improper and irrelevant evidence, (3) failing to properly instruct the jury and (4) denying his motion for acquittal pursuant to Crim.R. 29(A). Finally, Onaje contends that the trial court erred in applying the Reagan Tokes Law during sentencing and that his indefinite sentence, imposed under the Reagan Tokes Law, is unconstitutional.

{¶ 3} For the reasons that follow, we vacate Onaje's conviction on Count 27 — failure to comply with an order or signal of police officer in violation of R.C. 2921.331(B), a third-degree felony, with a one-year firearm specification. We otherwise affirm Onaje's convictions.

## I. Factual Background and Procedural History

### A. Juvenile Court Proceedings

{¶ 4} On June 21, 2019, the state filed a 31-count delinquency complaint in the Cuyahoga County Court of Common Pleas, Juvenile Division (Cuyahoga C.P. Juv. No. DL-19-107778) against Onaje (d.o.b. 4/5/2002), alleging that he had committed acts that would constitute the following crimes if he were an adult: one count of participating in a criminal gang, four counts of attempted murder, 13 counts of felonious assault, three counts of discharge of firearm on or near prohibited premises, three counts of improperly handling firearms in a motor vehicle, two counts of improperly discharging into habitation, three counts of failure to comply, one count of receiving stolen property and one count of having weapons while under disability. Most of the counts also included firearm specifications. The charges related, in large part, to (1) Onaje's alleged participation in three shooting incidents and (2) three incidents in which Onaje allegedly failed to comply with an order or signal of a police officer when police attempted to apprehend him. The three shooting incidents occurred on December 4, 2018 near East 114th Street and Forest Avenue in Cleveland (the "December 4, 2018 shooting"), on January 27, 2019 on Svec Avenue in Cleveland (the "January 27, 2019 shooting") and on January 29, 2019 on Cato Street in Maple Heights (the "January 29, 2019 shooting"). The three failure-to-comply incidents occurred on February 21, 2019, February 26, 2019 and March 13, 2019.

{¶ 5} Onaje's nephew, Jesse Sanders ("Sanders"), and Onaje's brother, Nasim Nicholson ("Nasim"), also allegedly participated in the shootings. A juvenile complaint was filed against Nasim and charges were filed in the general division against Sanders related to their roles in the shooting incidents. At the time of the three shooting incidents, Sanders was 18, Nasim was 17 and Onaje was 16.

{¶ 6} The state filed a notice of mandatory bindover to the general division and request for probable cause hearing.

### 1. Probable Cause Hearing

{¶ 7} On September 17 and 18, 2019, the juvenile court held a probable cause hearing with respect to the charges against Onaje and Nasim. Sanders[1] and Cleveland Police Detective Michael Harrigan ("Harrigan"), who worked in the Cleveland Police Department's Gang Impact Unit, testified at the hearing.

{¶ 8} Sanders testified that on December 4, 2018, he, Onaje, Nasim and James Booker were in Sanders' white Volkswagen Jetta, traveling on Forest Avenue in Cleveland, when they came upon a grey Ford Focus belonging to Tyski (a.k.a. "Ty"), a male whom they knew from the Buckeye neighborhood. Onaje was driving the Jetta, Sanders was in the passenger seat, Nasim was in the rear passenger seat behind Sanders and James Booker was seated behind Onaje. According to Sanders, as they passed the Focus, Onaje said, "There go Ty." Sanders stated that the others

---

[1] When he testified at the probable cause hearing, Sanders was facing charges in the general division relating to the three shooting incidents. No plea agreement had yet been reached, but Sanders indicated that he was cooperating with the state and had agreed to testify against Onaje at the probable cause hearing "in anticipation of working out a plea."

had "some beef" with Ty but that he did not know what it was about. Sanders testified that as the Jetta approached the Focus from behind, he saw someone "slouch down in the back" of the Focus and roll down the rear driver-side window. The Jetta then "sped up" "past them a little bit." When the Jetta drove past the Focus, Sanders saw that the person in the back of the Focus was Ty. Sanders testified that as the Focus turned right, away from the Jetta, Nasim used a black Glock handgun to shoot at the Focus. He stated that Nasim shot "for protection," i.e., "[b]ecause don't nobody wanna get shot, so he shot first." Sanders testified that he did not see whether the shots Nasim fired hit the Focus. Sanders claimed that he did not recall what anyone in the Jetta said when the shots were fired. After Nasim fired at the Focus, the Jetta left the scene.

{¶ 9} With respect to the second shooting incident, Sanders testified that on January 27, 2019, he, Nasim, Onaje and James Booker were traveling on Svec Avenue in a blue Nissan car Sanders had rented when Onaje said that he had "seen somebody from 131st." Sanders was driving, Onaje was in the front passenger seat and Nasim and James Booker were in the rear passenger seats. Sanders stated that he did not know whom Onaje had seen but that Onaje then leaned out the car window and started shooting at a sedan, using a black Glock handgun. Sanders stated that did not know how many shots Onaje fired, whether any of the shots struck the other car or whether the gun Onaje used was the same gun Nasim had used in the December 4, 2018 shooting.

{¶ 10} Sanders testified that after Onaje shot at the sedan, Sanders turned right onto Bartlett Avenue, drove around the block, then returned to Svec Avenue. Sanders testified that he stopped at a stop sign on Svec Avenue and that Nasim then got out of the car and began shooting at a male sitting in a parked car — the same car at which Onaje had been shooting — using a silver 1911 handgun. Sanders could not state how many shots Nasim fired but recalled that he shot more than once. No return shots were fired.

{¶ 11} With respect to the third shooting incident, Sanders testified that on January 29, 2019, he, Nasim and Onaje were, once again, traveling in his blue Nissan rental car. Onaje was driving, Sanders was in the front passenger seat and Nasim was seated in the rear. Sanders stated that Onaje drove the vehicle from the Nicholsons' house in South Euclid to a house on Cato Street in Maple Heights. Sanders testified that he did not know why they were driving to Maple Heights and did not recall any conversations they had along the way. According to Sanders, when they arrived at the house on Cato Street, Onaje pointed at the house and said, "[T]here go the house." Sanders stated that Onaje parked the Nissan a street over from the house on Cato Street and that Onaje and Nasim then exited the vehicle carrying black guns and walked towards the house. Sanders could not state whether these guns were the same guns used in the prior incidents. Sanders testified that he heard "more than five" gunshots and that Nasim and Onaje returned to the Nissan. When Nasim and Onaje returned to the vehicle, the guns were "put away." The group then drove back to the Nicholsons' house in South Euclid.

{¶ 12} Sanders denied that he was part of a gang and denied that there had been any plan or discussion, prior to or during the incidents, of trying to shoot or kill anyone. No person was shot or otherwise physically injured during any of the three shooting incidents.

{¶ 13} Harrigan was involved in investigating the three shooting incidents. He testified regarding what he learned during his investigation. Harrigan stated that on December 4, 2018, Allen Banks, Tykis Banks and Temiona Hudson were traveling on Forest Avenue in one vehicle and Onaje, Sanders, Nasim and James Booker were traveling on Forest Avenue in another vehicle. After someone saw Ty in Allen Banks' vehicle, Sanders' vehicle sped up to Allen Banks' vehicle. As Allen Banks' vehicle turned onto East 114th Street, Nasim began shooting at the vehicle, causing the vehicle to flip over. Harrigan stated that witnesses to the shooting confirmed that Onaje was driving Sanders' vehicle at the time of the shooting. Harrigan testified that were there four bullet holes in Allen Banks' vehicle following the incident and that five shell casings were recovered from the scene.

{¶ 14} With respect to the January 27, 2019 shooting, Harrigan testified that Sanders was driving a Nissan rental car, Onaje was in the front passenger seat and Nasim and James Booker were in the rear passenger seats. The vehicle was traveling eastbound on Svec Avenue when Onaje saw a vehicle he believed belonged to someone "he ha[d] an issue with" from 131st Street and began firing at the vehicle, which belonged to Jimmy Horton. Sanders drove around the block, then stopped the Nissan. Nasim exited the Nissan and again fired at the vehicle. Harrigan

testified that there were bullet holes in Horton's vehicle following the incident and that 15 shell casings were recovered at the scene.

{¶ 15} Harrigan testified that there were eight victims in the January 29, 2019 shooting incident. He stated that on January 29, 2019, Sanders, Nasim and Onaje drove toward a house on Cato Street in Maples Heights in Sanders' Nissan rental car and parked a street away. Onaje and Nasim then exited the vehicle, went through a backyard and shot at the house, striking it several times. Harrigan testified that two sets of shell casings were recovered from the scene and that, based on the ballistics report, one of those sets of shell casings matched the shell casings found at the crime scene on Svec Avenue. He stated that, to his knowledge, there was no match between the shell casings recovered from the crime scene on Svec Avenue and those recovered from the crime scene of East 114th Street and Forest Avenue.

{¶ 16} Harrigan testified that, with regard to his understanding of who was present and what happened during each of the shooting incidents, he relied primarily on statements made by Sanders following his arrest. He indicated, however, that "each of the details" Sanders provided was "corroborated by what actually happened in those incidents" as described by other witnesses. Harrigan also testified that, even prior to talking with Sanders, he had interviewed Malik Booker ("Malik"), the brother of James Booker. He stated that Malik provided him with information regarding the shootings Malik had received from Onaje and Nasim — i.e., that Onaje and Nasim would tell Malik "stories about what happened" — and

that Malik provided Harrigan with "almost an identical rendition of [the] facts" Sanders had told him.

{¶ 17} Harrigan testified that a warrant was issued for Onaje's arrest after a witness identified him in a photo array in connection with the December 4, 2018 shooting and that the police thereafter attempted to apprehend Onaje.

{¶ 18} Harrigan testified that at approximately 10:00 p.m. on February 21, 2019, he and other members of the gang impact unit were "operating in the area" when they observed Onaje exit a silver Volvo at a gas station located on the corner of Lee Road and Harvard Avenue in Cleveland. He stated that Onaje went into the gas station briefly and then came back out. As Onaje walked back to the vehicle, other members of the gang impact unit drove their vehicle into the gas station behind Onaje's vehicle and activated their lights. Onaje got back into the Volvo in the driver's seat, drove through and out of the parking lot into traffic without stopping, ran a red light and escaped.

{¶ 19} Harrigan testified that five days later, on February 26, 2019, officers were conducting surveillance when another officer observed the same silver Volvo pull into the driveway of the Nicholsons' family residence on Stonehaven Road in South Euclid. An individual exited the vehicle, went into the house briefly, then returned to the vehicle. Harrigan stated that his unit sought the assistance of South Euclid police to arrest Onaje because they were "operating in an undercover capacity" at the time. Harrigan testified that the Volvo left the home and ultimately turned onto Warrensville Center Road in South Euclid. Harrigan stated that he

relayed information regarding the vehicle to the South Euclid dispatcher and that two South Euclid police vehicles responded. He indicated that South Euclid police located the Volvo, activated their lights and sirens and that the Volvo fled. He stated that South Euclid police pursued the Volvo "for a short time" until they lost the Volvo or the pursuit was otherwise called off. Harrigan testified that five minutes later, the vehicle was found abandoned with a loaded Glock and a hoodie containing "airbrushed gang paraphernalia," i.e., "President RS" airbrushed on the front of the hoodie and "Buckeye Road 116" with broken hearts airbrushed on the back. Harrigan testified that he had previously seen Onaje wearing that hoodie in postings on social media.

{¶ 20} Harrigan stated that on March 13, 2019, he and other members of the gang impact unit were working on an unrelated matter, i.e., observing what they believed to be a drug transaction at a Dairy Mart located on West 105th Street in Cleveland, when a silver Ford Ranger pickup truck with a maroon door pulled up at a high rate of speed. He stated that officers initially pursued, then lost, the vehicle before locating it again at a gas station on West 73rd Street and Lorain Avenue. When the driver of the pickup truck exited the vehicle at the gas station, officers identified him as Onaje. After the pickup truck left the gas station and pulled into a driveway of a residence on Colgate Avenue in Cleveland, officers positioned their vehicles behind the vehicle, obstructing its ability to back out of the driveway, and activated their lights and sirens. The pickup truck backed up briefly, then drove onto the sidewalk on Colgate Avenue, back into the street and out of the sight of officers.

Harrigan stated that Onaje was eventually arrested on his warrant in South Euclid by South Euclid police.

{¶ 21} Harrigan testified that after Sanders was arrested in April 2019, he spoke with police and provided officers with information enabling them to obtain an arrest warrant for Nasim. Nasim was arrested at his home the following day.

{¶ 22} Harrigan testified that he interviewed Nasim following his arrest. During the interview, Nasim denied being involved in the December 4, 2018 incident. Nasim claimed to be the only person involved in the January 27, 2019 shooting, i.e., that he drove down Svec Avenue, saw the car, shot at it, then drove around the block and shot at it a second time. Nasim stated that he had been "targeting" a male named "Pablo" because a couple days earlier "Pablo" and someone else had come to Malik Booker's house and began shooting at them. "Pablo" was not, however, the person in the car at the time of the shooting. Harrigan stated that Nasim provided no information regarding the January 29, 2019 shooting.

{¶ 23} Harrigan also testified regarding his investigation into the Real Shooters as a potential criminal gang, "a subset underneath the Heartless Felons umbrella." He stated that the Real Shooters had been "on the radar" of the gang impact unit since approximately December 2018.

{¶ 24} Harrigan stated that, based on his investigation, the Real Shooters go by names unique to Real Shooters — "RS" or "1723" — reflecting their area of operation as "East 117th [Street] up to East 123rd [Street] in the area of Kinsman

and the surrounding areas up to Buckeye." He stated that Sanders, Nasim, Onaje, James Booker, Malik Booker, Darren Allen, Safear Billups, Daquan Dix, Leslie Evans and Anthony Sumpter were all members of the Real Shooters. Harrigan identified social media postings and photographs of members depicting them with firearms, wearing clothing with the designation "RS" and displaying similar, unique hand signs. Harrigan indicated that Onaje, Nasim and other members used Instagram names that included RS and that Onaje had referred to himself as the "president" of Real Shooters.

{¶ 25} At the probable cause hearing, the parties stipulated to Onaje's date of birth and to the admissibility of a Firearm and Tool Mark Unit Report (the "comparison report") prepared by Kristin Koeth, a forensic scientist and firearms examiner with the Cuyahoga County Regional Forensic Science Laboratory's Firearm and Tool Mark Unit. Koeth had compared certain shell casings recovered from the crime scenes on Svec Avenue and Cato Street and concluded that they were fired by the same gun.

### 2. The Juvenile Court's Transfer Order

{¶ 26} At the conclusion of the probable cause hearing, the juvenile court found that Onaje was 16 years or older at the time of the conduct charged, that there was probable cause to believe that Onaje had committed each of the acts with which he had been charged and that Onaje was subject to mandatory bindover to the general division. On September 19, 2019, jurisdiction over the case was transferred to the general division.

**B. Proceedings in the General Division**

{¶ 27} On October 8, 2019, a Cuyahoga County Grand Jury indicted Onaje, Nasim and Sanders (collectively, the "defendants") in a 28-count indictment as follows:[2]

- One count of participating in a criminal gang in violation of R.C. 2923.42(A), a second-degree felony (Count 1);

- Four counts of attempted murder in violation of R.C 2923.02/2903.02(A), a first-degree felony (Counts 2-4, 10);

- Thirteen counts of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony (Counts 5-7, 11, 14-22);

- Three counts of discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), a third-degree felony (Counts 8, 12, 25);

- Two counts of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), a fourth-degree felony (Counts 9, 13);

- Two counts of improperly discharging a firearm into a habitation in violation of R.C. 2923.161(A)(1), a second-degree felony (Counts 23-24); and

- Three counts of failure to comply with order or signal of police officer in violation of R.C. 2921.331(B), a third-degree felony (Counts 26-28).

Most of the counts included firearm specifications. The failure-to-comply counts also included a furthermore specification that the operation of the motor vehicle by

---

[2] Onaje was indicted on all 28 counts. Nasim and Sanders were indicted on Counts 1-25.

the offender caused a substantial risk of serious physical harm to persons or property.

{¶ 28} Count 1 related to the defendants' alleged participation in criminal gang activity from August 1, 2018 to June 19, 2019. Counts 2-9 related to the defendants' alleged participation in the December 4, 2018 shooting incident. Counts 10-13 related to the defendants' alleged participation in the January 27, 2019 shooting incident. Counts 14-25 related to the defendants' alleged participation in the January 29, 2019 shooting incident. Counts 26-28 related to the three incidents in which Onaje allegedly failed to comply with a police order or signal when officers attempted to apprehend him on February 21, 2019, February 26, 2019 and March 13, 2019.

### 1. The Trial

{¶ 29} On February 24, 2020, the case proceeded to a jury trial on the charges against Onaje and Nasim. Prior to trial, Sanders entered into a plea agreement with the state pursuant to which Sanders agreed to plead guilty to three amended counts of felonious assault in violation of R.C. 2903.11(A)(2) — one count for each of the three shooting incidents — and to testify against Nasim and Onaje at trial "truthfully and consistently with any prior statements" he had made. In exchange for his guilty pleas, the remaining counts were nolled. There was no agreement as to the sentence Sanders would receive.

{¶ 30} Sixteen witnesses testified on behalf of the state at the trial, including Sanders, Harrigan, Koeth, Sergeant Alfred Johnson of the Cleveland Police Gang

Impact Unit, numerous responding police officers, Horton (the victim in the January 27, 2019 shooting) and Ashley Brooks (one of the victims of the January 29, 2019 shooting).[3] No witnesses testified on behalf of the defense. A summary of the relevant evidence follows.

### a. The Three Shooting Incidents

### i. The December 4, 2018 Shooting

{¶ 31} Sanders' trial testimony was similar to his testimony at the probable cause hearing. Sanders testified that he had known Nasim and Onaje their entire lives and that he had known Malik Booker and James Booker for at least ten years.

{¶ 32} Sanders testified that on the afternoon of December 4, 2018, he, Nasim, Onaje and James Booker were in Sanders' white Volkswagen Jetta traveling to the house of Erica Booker (the mother of Malik and James Booker), located off Svec Avenue in Cleveland, where the group "hung out" almost every day. According to Sanders, Onaje was driving, Sanders was in the front passenger seat, Nasim was in the rear passenger seat behind him and James Booker was in the rear passenger seat behind Onaje. Sanders testified that as the Jetta travelled on Forest Avenue near East 116th Street, they passed a grey Ford travelling in the opposite direction. As they passed the Ford — the "known vehicle" of Tykis Banks — Onaje stated, "There go Ty." Onaje rolled down his window, stuck two fingers out the window in

---

[3] In addition to witness testimony, the state introduced over 200 exhibits into evidence, including crime scene photographs, recordings of 911 calls, stills of surveillance footage, screenshots and downloads of photographs and videos posted on social media, text messages, crime scene reports, the comparison report, a videotaped police interview of Nasim, shell casings and the gun and RS hoodie police recovered on February 26, 2019.

a peace sign and blew the car's horn. According to Sanders, based on prior conversations he had with Onaje, Onaje believed that Ty "had something to do with" the murder of an individual named "Muddy," whom the Nicholson brothers had known from the Buckeye neighborhood.

{¶ 33} Sanders testified that Onaje then turned the car around and traveled back towards the Ford. Sanders stated that someone in the Ford rolled down the vehicle's rear passenger window, suggesting to Sanders that someone might shoot at them. Sanders could not see who was in the Ford. Sanders testified that Onaje "spe[d] up a little bit" until the passenger side of the Jetta was alongside the driver side of the Ford. Nasim then leaned out of the Jetta's rear passenger-side window and fired three to five shots at the Ford using a black Glock handgun. According to Sanders, Nasim did not say anything as he shot at the Ford. After Nasim shot at the Ford, the Ford turned onto a side street. No return shots were fired from the Ford.

{¶ 34} Cleveland Police Patrol Officer John Jarrell was one of the responding officers to the December 4, 2018 shooting. He testified that when he arrived on the scene, he observed a vehicle on East 114th Street, upside down on its hood with bullet holes, and that he spoke with two of the vehicle's occupants, Allen Banks and Te'Miona Hudson, regarding what had occurred. According to Officer Jarrell, Allen Banks told police that he was driving his vehicle westbound on Forest Avenue when another vehicle began to follow him. Banks stated that the vehicle went around Banks' vehicle, and someone leaned out of the driver side of the vehicle and began

shooting at Banks' vehicle. Banks swerved to avoid the gunfire, lost control of the vehicle and Banks' vehicle flipped over.

{¶ 35} Officer Jarrell testified that he observed bullet holes in the Ford and checked the area for any surveillance video footage that may have captured the incident. He stated that he found a neighbor who had surveillance footage that showed a white vehicle with what appeared to be an individual leaning out of the rear driver-side window, stretching out his arm. Cleveland Police Detective Troy Edge, who processed the Ford following the incident, testified that the bullet holes were on the right rear passenger side of the Ford. Five spent shell casings were collected from the scene of the December 4, 2018 incident.

### ii. The January 27, 2019 Shooting

{¶ 36} Sanders testified that on January 27, 2019, he, Nasim and Onaje[4] were driving around in a blue Nissan Sentra rental car Sanders was using because his Jetta had been in accident and was being repaired. Sanders was driving, Onaje was in the front passenger seat and Nasim was in the rear passenger seat. Sanders testified that as they traveled on Svec Avenue toward East 140th Street, Onaje saw a brownish-gold Chevy Impala parked on the street. Sanders stated that Onaje said either "[t]here go Pablo" or "[t]hat's his car," referring to Pablo, someone who was "supposed to be from 131st." According to Sanders, he "slowed up," and Onaje climbed out of the open front passenger-side window. Onaje sat on the "windowsill"

---

[4] On cross-examination, Sanders acknowledged that, in the written statement he gave police, he stated that James Booker was also in the car at this time, but that he did not recollect that at the time of trial.

of the door and "just started shooting at the car" as they drove by. Sanders could not state exactly how many shots were fired but knew that it was "[m]ore than five."

{¶ 37} Sanders kept driving. He testified that he drove the Nissan around the block and came back. As they approached the Impala a second time, Nasim exited the car and started shooting at the Impala (or someone near the Impala who was attempting to "duck for cover") using a silver 1911 handgun.

{¶ 38} Horton testified that on the evening of January 27, 2019, he was sitting in the driver seat of his sister's grey 2006 or 2007 Chevy Impala, which was parked on the street in front of a friend's house on Svec Avenue. Horton stated that he had driven to the friend's house to get a haircut. As he was looking for his friend's number on his cell phone to let him know he had arrived, a dark-colored SUV "pulled up kind of slow." After the vehicle traveled "maybe three cars" ahead of Horton's vehicle, a black male crawled out the rear driver-side window, sat on the door, placed his arm on the top of the car and started shooting at Horton, "empt[ying] the gun on [him]." Horton testified that he ducked down in the car, waited until the shooting stopped and then exited the vehicle. As Horton walked around the Impala, he heard "maybe three or four" more gunshots "coming through the trees" as the SUV came back. Horton stated that he hid behind a neighbor's porch until the shooting stopped, then ran into his friend's house and his friend called the police.

{¶ 39} Horton testified that the Impala was "[f]ull of bullet holes" as a result of the shooting but that he was not hit. Horton stated that he did not understand why anyone would be shooting at him because he had no enemies and "hadn't done

nothing to nobody." Horton could not identify the shooter or describe him other than to state that the shooter was a black male.

{¶ 40} Cleveland Police Officer Clayton Ellenberger was one of the responding officers to the January 27, 2019 shooting. He testified that he interviewed Horton, who informed him that shots had been fired at his vehicle, a Chevy Impala. According to Officer Ellenberger, Horton told the officers that the shots came from an unidentified black vehicle and that the shooter was hanging out the window, wearing a grey hooded sweatshirt. Officer Ellenberger testified that he and his partner collected 15 .40-caliber spent shell casings at the scene and that these shell casings were not consistent with use of a 1911 handgun.

{¶ 41} Nasim offered a different version of events regarding the January 27, 2019 incident. In a post-arrest interview with police — portions of which were introduced into evidence — Nasim stated that he was going to "take this" for his brother and claimed that he was the only person in the vehicle at the time of the January 27, 2019 shooting. Nasim told police that "Pablo" shot at Nasim, so Nasim shot back.

### iii. The January 29, 2019 Shooting

{¶ 42} The third shooting occurred two days later on January 29, 2019. Sanders testified that between 4 a.m. and 6 a.m. on January 29, 2019, he, Onaje and Nasim left the Nicholsons' house in South Euclid in his Nissan rental car and traveled to Cato Street in Maple Heights. Onaje was driving, Sanders was in the

front passenger seat and Nasim was in the rear passenger seat. According to Sanders, Onaje pointed to a house on Cato Street and identified it as "Yelly's house."

{¶ 43} Sanders testified that Onaje drove the car around the corner and parked it on Arch Street. Onaje and Nasim then got out of the car and "ran between houses" and toward Yelly's house. Sanders remained in the car. Sanders stated that he heard "[p]robably like ten" gunshots after which Onaje and Nasim ran back to the car. Sanders stated that he did not see Onaje or Nasim with guns at any point that night or morning and that nothing was said at that time about Yelly or anyone else. Sanders testified that Onaje and Nasim were gone for approximately two or three minutes before returning to the car. Onaje and Nasim got into the car and they drove back to the Nicholsons' house.

{¶ 44} Neighbor Adam Raphael made a 911 call after he heard gunshots in the early morning on January 29, 2019. He testified that after he heard the gunshots, he saw two individuals run down a driveway from the direction of Cato Street, turn and then run down Arch Street in the direction of Libby Road.

{¶ 45} Maple Heights Police Officer Aaron Carmine was one of the responding officers to the January 29, 2019 shooting. As he drove down Cato Street, he observed a vehicle parked in the street that had bullet holes in the window and a nearby house on Cato Street ("Brooks' house") that had at least one bullet lodged in the front. As he continued his investigation of the area, he was approached by a resident who stated that he had observed two males leaving the driveway of a house on Arch Street and heading south on Arch Street towards Libby Road. Officer

Carmine testified that he went to the driveway of that residence and followed footprints in the snow leading to the rear of the garage where he observed "[t]wo very distinctive groupings" of shell casings a couple feet apart. He stated that he collected a total of 16 .40-caliber shell casings and 18 9 mm shell casings at the scene. Officer Carmine stated that they "eventually counted 16 different bullet holes" in the front of Brooks' house, more than 20 bullet holes inside Brooks' house and a bullet hole inside the neighboring house on Cato Street, owned by Maxine Fuller.

{¶ 46} Forensic scientist and firearm and toolmark examiner, Kristen Koeth, examined the .40 cartridge cases collected at the scene of the January 27, 2019 and January 29, 2019 shootings. She testified that, based on her examination of the markings, the .40-caliber cartridge cases recovered from the scene of the January 27, 2019 shooting and the .40-caliber cartridge cases recovered from the scene of the January 29, 2019 shooting were fired from the same Glock firearm. She stated, however, that she had no firearm against which to compare any of the cartridge cases.

{¶ 47} Brooks lived at the house on Cato Street along with her brother, Delvonte Philpotts (a.k.a. "Yelly"), and her three young children. Brooks testified that her friend Jean Jones, her friend's daughter, W.H., and her brother's friend, Walter Jackson, were also in the home at the time of the January 29, 2019 shooting.[5]

---

[5] W.H. was not named in the indictment. In Count 19, the state alleged that Canen Summerville was in Brooks' house at the time of the January 29, 2019 shooting. In closing argument, the state conceded that it had presented no evidence that Summerville was there at that time.

Brooks stated that on the morning of January 29, 2019, she was sleeping and awoke to a "large boom." She indicated that the noise woke Philpotts and that he started yelling and screaming that someone had shot the house.

{¶ 48} Officer Carmine stated that he made contact with the individuals who had been in Brooks' house at the time of the shooting, including Brooks and her children, her brother, Philpotts, Jones and Jackson and questioned them. Officer Carmine testified that Brooks told him that she had been "having issues" with people on Instagram and identified "Puff" (a.k.a. Darren Allen) and Onaje as individuals she believed were involved in the shooting because they had been "threatening" her and "planning to kill" her and had sent her messages stating, "I know where Cato at."

{¶ 49} Former Maple Heights Police Detective (now Middleburg Heights Police Detective) Jason Ponyicky, who was assigned to investigate the January 29, 2019 shooting incident, offered similar testimony. Detective Ponyicky testified that, during an interview, Brooks stated she suspected Puff and Onaje were responsible for the shooting based on postings Onaje had made on his Instagram story — of which of Brooks had taken screenshots and provided to police.

{¶ 50} Brooks testified that Onaje and Philpotts had once been friends but that in September 2018, Philpotts was shot in the head and leg in a drive-by shooting. Brooks stated that Onaje's cousin had been killed in that shooting incident and that she believed Onaje held Philpotts responsible for his death. Brooks stated that after Philpotts was shot, she started going through her brother's Instagram

account and noticed a number of threats directed against him by Puff and Onaje, who had been messaging Philpotts' Instagram account. Brooks testified that she began responding to these messages using Philpotts' Instagram account. Brooks stated that in responding to these messages, she identified who she was, but then deleted their exchanges so Philpotts would not see them. She claimed that she tried to "cool down the beef" between Philpotts and Puff and Onaje, "not trying to dog them or hurt them, just talk[ing] to them like can we not do this because it can go farther than where it need to go to."

{¶ 51} Brooks testified that Onaje had shared her address on social media prior to the January 29, 2019 shooting and that she "feared this was going to happen." Brooks identified screenshots she had taken (using her brother's Instagram account) of posts Onaje had made on his Instagram story prior to the shooting. They include statements such as, "Don't freeze up now because your addy known" (which Detective Ponyicky interpreted as, "Don't be scared now because we know your address"), "Can't even bang with the ops because these hoes on police s***" (which Detective Ponyicky interpreted as, "Something to the effect can't keep up with * * * us * * * — the opposition are said to be hoes and they're informing or they're telling on stuff") and "Can't even bang with the ops cuz these hoes on police s***" and "Matter of fact, f*** that hoe. She a part of they clique." Detective Ponyicky testified that Brooks also showed him a post on Onaje's Instagram account that included Brooks' address with "some sort of an emoji."

{¶ 52} After the shooting, Brooks put a post on her Facebook page regarding the incident, stating in part:

> [M]orning around five a.m. and shot up my house and grazed one of my children. I have went [sic] to the police and I am asking for any help in finding them. I posted one on my timeline a couple of months ago and he still won't stop until someone is dead. It's sad & sick how simple minded some of today's black youth are. I will not let up until they are in prison. Puff is in the red and OJ is in the white. Enough is enough[.]

{¶ 53} Although Brooks stated in her Facebook post that one of her children had been grazed in the January 29, 2019, she testified at trial that that did not actually happen. She stated that she posted that, even though it was not true, "[t]o scare them," "[t]o let them know that things like that can happen when you shoot into a house with children."

{¶ 54} Sanders testified that later that day, on January 29, 2019, he received a call from Puff, who said that "Yelly's sister," i.e., Brooks, was posting about the January 29, 2019 shooting on Facebook and was claiming Puff, Onaje and Nasim were responsible for the shooting and had "grazed a baby" during the incident. Sanders testified that he didn't know how Puff knew Sanders was involved in the incident but that Puff told him about the Facebook post so that he could tell Onaje and Nasim. Sanders stated that he then texted Onaje, "One of y'all grazed a baby." Onaje replied three minutes later, inquiring "How u kno?" Sanders responded: "Puff called and said they posted it on [Facebook]." Approximately 25 minutes later, Onaje responded, "Bet," meaning "okay." The state introduced copies of these text messages into evidence.

## b. Investigation of the Real Shooters

{¶ 55} Sergeant Johnson and Harrigan testified at trial regarding their investigation of the Real Shooters and whether it was a criminal gang. Sergeant Johnson — a "certified expert" in Greater Cleveland gangs since 2015[6] — testified that the Real Shooters gang initially came to his attention "towards the end of 2018" following an incident near East 117th Street and Kinsman Avenue. Sergeant Johnson indicated that the gang unit believed the incident had "something to do with gangs" because (1) some "interesting" graffiti had been spraypainted on an abandoned house, i.e., "1723" (with 17 and 23 representing the number of rounds that can be loaded into a firearm), (2) an arrest was made, (3) police recovered more than one firearm and (4) several males exited a vehicle and "took off running" in connection with the incident.

{¶ 56} Sergeant Johnson testified that following the December 4, 2018 shooting, a high school gang officer reached out to him and asked him to speak with a concerned parent regarding the shooting. Sergeant Johnson indicated that he spoke with the mother of one of the victims and that, based on information she provided, he began following the social media accounts of Onaje, Puff and Malik Booker (and those who followed them or commented on their social media posts).

---

[6] Both Sergeant Johnson and Harrigan were qualified as Cleveland gang experts at trial. Onaje's counsel stipulated to Sergeant Johnson's qualification as an expert with respect to "gang investigation generally" but "reserve[d] the right to argue on specific parts of the testimony as they relate[d] to [Onaje]." Onaje's counsel objected to the qualification of Harrigan as a Cleveland gang expert.

He stated that he began tracking information gleaned from their social media posts regarding guns, criminal activity and associations with others.

{¶ 57} Sergeant Johnson testified that in considering whether a criminal gang exists, he looks at the "totality of the circumstances," including whether a group of three or more individuals collectively or individually commits particular crimes specified in Ohio Revised Code, whether there is a commonality of area or territory and whether there are common hand signs, symbols, markings and colors.

{¶ 58} Sergeant Johnson testified that the photographs these individuals posted on social media were generally of themselves holding guns, which he indicated was significant because gangs "boast" back and forth on social media by showing who has access to guns. He stated that about once a week he would see an image posted of Onaje with a firearm — either posted by Onaje himself on his social media account or by another of the other individuals with whom he was associated on their social media accounts. He testified that gangs typically use illegally obtained firearms and frequently trade guns among the gang members, especially if a gun has been used by a member in a shooting.

{¶ 59} Although Sanders denied being a member of the Real Shooters himself, he testified that Onaje, Nasim and Puff identified themselves as members of a "group" called the Real Shooters, which they abbreviated as "RS." Sanders testified that Onaje, Nasim and Puff all used Instagram names beginning with "rs," i.e., "rs_ojayy116" (Onaje), "rs_nas4rmtha6" (Nasim) and "rs_puffdiditagain" (Puff). Sanders stated that Onaje and Nasim carried guns "every day" in 2018 and

2019 and that guns would be passed around the group. Although Sanders claimed that he did not own any guns, he testified that he had taken selfies of himself with guns or had posed for pictures with guns, including a gun he had borrowed from Onaje.

{¶ 60} Harrigan took over the investigation of the Real Shooters from Sergeant Johnson in January 2019. Like Sergeant Johnson, Harrigan testified that, in considering whether criminal gang activity exists, he looks for territory, clothing, "signs, symbols, colors, common name, three or more persons, and the elements of the * * * crimes committed by members."

{¶ 61} Sergeant Johnson and Harrigan described the Real Shooters' area of operation or "territory" as "117th near the area of 116th and Kinsman, Buckeye" or East 117th Street up to East 123rd Street, between Kinsman and Buckeye Roads, in Cleveland. Harrigan stated that there are "approximately six identified members of the Real Shooters criminal gang," including Onaje (who wore clothing identifying himself as "president" of "RS"), Nasim, Sanders, Malik Booker and Puff (who identified himself as the "captain" of "RS" in a social media post).[7]

{¶ 62} Sergeant Johnson and Harrigan testified that although the Real Shooters was a criminal gang in and of itself, the Real Shooters was also associated

---

[7] Although Harrigan stated that there are "approximately six identified members," he did not specifically identify, at this point in his testimony, all of the members. At other points in his testimony, Harrigan identified Saphir Bullips, Daequan Dix, Leslie Evans and Anthony Sumpter as also being associated with the Real Shooters. The names of certain of persons associated with the Real Shooters were spelled differently in the trial transcript than in the transcript from the probable cause hearing. It is unknown which spelling is correct.

with the Heartless Felons gang, which operated as an "umbrella gang," i.e., "the big brother gang that overlooks whatever gang is underneath it." The officers identified numerous social media posts, photographs and videos depicting firearms, unique, consistent signs used by Real Shooters (e.g., thumb, index and middle fingers extended and other fingers pulled down to represent a firearm that is pointed at the temple or an actual firearm pointed at the temple) and Heartless Felons gang members (e.g., two middle fingers folded down into the palm, the other fingers extended or the ring finger pulled down and the other fingers extended with the middle finger crossed over the index finger) and the use of other text, numbers or graphic symbols representing gang membership, such as "RS," or "rs," 116 or 1723 (for the Real Shooters or their territory) or broken hearts or twisted fingers (for the Heartless Felons).   Copies of nearly 100 of these photographs, videos and social media postings related to the Real Shooters were introduced into evidence.

### c.  Onaje's Association with the Real Shooters

{¶ 63} With respect to Onaje's association with the Real Shooters, Sergeant Johnson and Harrigan identified numerous photographs and videos of Onaje obtained from social media postings from January 2019 through July 2019, in which Onaje was holding up gang signs for the Real Shooters and/or Heartless Felons, was wearing apparel with numbers and symbols associated with the Real Shooters and/or Heatless Felons and/or was holding one or more firearms — often with the other defendants or other known members of the Real Shooters, including Nasim, Puff and Malik Booker.   A number of these social postings were viewed on

January 29, 2019 — the date of the third shooting incident. Sergeant Johnson testified that Onaje's Instagram account name at the time of the January 29, 2019 shooting was "rs_ojayy116" and that other suspected members of the Real Shooters used a similar prefatory "rs" in their Instagram account names. At various times, Onaje also used other Instagram accounts with connections to the Real Shooters, including rs_ojayy, rs_ojay00 and ojayy116.

### d. Failure-to-Comply Charges

### i. February 21, 2019 Failure to Comply

{¶ 64} Sergeant Johnson testified that on February 21, 2019, he and other officers from the gang unit were working in the area of Lee Road and Harvard Avenue in Cleveland. They had a warrant for Onaje's arrest and were attempting to locate him to arrest him. Sergeant Johnson stated that they spotted Onaje driving a silver Volvo as he pulled into a gas station on the corner of Lee Road and Harvard Avenue. Onaje parked the Volvo and went into the gas station. Sergeant Johnson testified that officers were hoping to apprehend Onaje before he got back into the Volvo but were unable to do so. Sergeant Johnson stated that he was driving an unmarked black Tahoe truck with lights and in the front and back windows and a siren he could also activate. He testified that he pulled his vehicle in front of the Volvo, in an attempt to block the Volvo, and activated his lights.

{¶ 65} Sergeant Johnson stated that Onaje ignored the lights, maneuvered his vehicle around Sergeant Johnson's vehicle and took off into traffic, heading northbound on Lee Road. Sergeant Johnson stated that he was "[a]bsolutely"

certain that Onaje was the person he had seen getting into the silver Volvo. Sergeant Johnson testified that he "did not say a word" to Onaje at that time because he "never got a chance."

{¶ 66} Harrigan was also in the area in an undercover vehicle at the time. He testified that he saw a male in a red coat get into the driver's seat of the silver Volvo, that the lights were activated on Sergeant Johnson's vehicle as well as on another police vehicle that pulled in as the male was getting into the Volvo. He stated that the Volvo pulled out of the parking lot, without stopping, and continued at a high rate of speed northbound on Lee Road. Sergeant Johnson stated that because of heavy traffic, officers were not able to safely pursue the Volvo and Onaje eluded them.

### ii. February 26, 2019 Failure to Comply

{¶ 67} Officers allegedly attempted to arrest Onaje a second time on February 26, 2019 at his home on Southhaven Road in South Euclid. Sergeant Johnson testified that he was watching the home from a Wal-Mart parking lot approximately eight houses away when a silver Volvo — the same vehicle in which they had previously seen Onaje — pulled into the driveway, and a male exited the vehicle and entered the house. After a short period of time, the male returned to the vehicle and the vehicle left. Sergeant Johnson stated that he wasn't "quite sure" if the male he had seen was Onaje. Sergeant Johnson testified that he asked Harrigan, who was in the area in an undercover vehicle, to contact South Euclid police and request that they conduct a traffic stop on the vehicle. Harrigan testified that he

contacted South Euclid police and gave them the information necessary to pursue the vehicle. He indicated that South Euclid police activated their lights and sirens and attempted a traffic stop of the vehicle, but the vehicle did not stop. Sergeant Johnson testified that multiple different agencies attempted to stop the vehicle but that they "ended up losing the vehicle" because of "the way the vehicle was driving," i.e., speeding and ignoring stop signs and red traffic signals. The Volvo proceeded through several jurisdictions until it finally stopped at the Shaker Heights Country Club.

{¶ 68} When officers located the Volvo, the occupants had abandoned the vehicle. Officers conducted a search of the Volvo and recovered a loaded Glock 22 and a black and purple hoodie with "President RS" airbrushed on the front and "Buckeye," "116" and broken hearts airbrushed on the back (the "RS hoodie"). Sergeant Johnson testified that he recognized the hoodie as one he had seen Onaje wearing in photographs posted on social media. The firearm recovered from the Volvo was submitted for testing but did not match the shell casings recovered from the scenes of any of the three shootings at issue here.

### iii.  March 13, 2019 Failure to Comply

{¶ 69} In the early evening of March 13, 2019, officers attempted to apprehend Onaje a third time. Sergeant Johnson testified that he, Harrigan and other officers from the gang unit were working in the area of West 105th Street and Thrush Avenue on an unrelated matter — following a target who was allegedly selling marijuana and observing what they believed to be a drug transaction

involving the target at a convenience store — when they saw a grey or silver Ford Ranger pickup truck with one red or "maroonish red" door in the parking lot. Sergeant Johnson testified that he had previously seen Erica Booker driving that pickup truck and told other undercover detectives to follow the pickup truck. Due to the speed at which the pickup truck was travelling, the undercover vehicles could not keep up with it and initially lost it.

{¶ 70} Sergeant Johnson testified that, after the target returned home, he continued the search for the pickup truck. He stated that he located it at a gas station on West 73rd Street and Lorain Avenue and saw Onaje walking back towards the vehicle from the gas station. He stated that there was no "mistaking" that the individual he saw was Onaje. Sergeant Johnson called for backup to assist him in attempting a traffic stop.

{¶ 71} Harrigan testified that his vehicle was behind Sergeant Johnson's vehicle when the pickup truck pulled out of the gas station and drove to a driveway off Colgate Avenue. Sergeant Johnson testified that he activated his lights and attempted to "box" the pickup "into the driveway." Harrigan stated that he also activated his lights and sirens. Sergeant Johnson and Harrigan testified that Onaje put the pickup truck in reverse, drove out around Sergeant Johnson's vehicle, drove on the sidewalk and fled eastbound on Colgate Avenue towards West 65th Street. Sergeant Johnson stated that he followed the pickup with his lights and sirens activated until the vehicle reached West 57th Street and Detroit. At that point, Sergeant Johnson stated, he turned off his lights and sirens because it was a business

area with a lot of people and he did not want an innocent person to be struck by a vehicle. Sergeant Johnson testified that other officers continued pursuit of the vehicle, but, due to the pickup's excessive speed and failure to comply with traffic control signals, they ultimately lost sight of the vehicle.

## 2. Crim.R. 29(A) Motion

{¶ 72} At the close of the state's case, Onaje moved for acquittal pursuant to Crim.R. 29, arguing that the state had failed to present sufficient evidence to support a conviction on any of the offenses with which he had been charged. The trial court denied the motion. The defense rested without presenting any witness testimony.

## 3. The Jury's Verdict

{¶ 73} After deliberating, the jury found Onaje guilty of:

- One count of participating in a criminal gang in violation of R.C. 2923.42(A), a second-degree felony, with one-year and three-year firearm specifications (Count 1);

- Eight counts of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, with one-year and three-year firearm specifications (Counts 14-18, 20-22);

- Two counts of improperly discharging a firearm into a habitation in violation of R.C. 2923.161(A)(1), a second-degree felony, with one-year and three-year firearm specifications (Counts 23-24);

- One count of discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), a third-degree felony, with one-year and three-year firearm specifications (Count 25); and

- Three counts of failure to comply with order or signal of police officer] in violation of R.C. 2921.331(B), a third-degree felony, with furthermore specifications and a one-year firearm specification on Count 27 (Counts 26-28).

The jury found Onaje not guilty of the remaining counts and firearm specifications.

### 4. Sentencing

{¶ 74} On September 8, 2020, the trial court held a sentencing hearing. The trial court determined that Counts 24 and 25 merged with Count 23 for sentencing, and the state elected to proceed to sentencing on Count 23. At the sentencing hearing, the trial court announced an aggregate prison sentence of 21-25 years as follows:

- As to Count 1: Three years on the three-year firearm specification to be served prior to and consecutive to a minimum prison term of eight years and a maximum prison term of 12 years on the underlying offense.

- As to Counts 14-18 and 20-22: Three years on the three-year firearm specifications to be served prior to and consecutive to eight years on the underlying offenses.

- As to Count 23: Three years on the three-year firearm specification to be served prior to and consecutive to eight years on the underlying offense.

- As to Counts 26 and 28: 36 months.

- As to Count 27: One year on the firearm specification to be served prior to and consecutive to 36 months on the underlying offense.[8]

{¶ 75} The trial court stated that the three-year sentences on the three-year firearm specifications in Counts 1, 14 and 23 would be served consecutively and that the sentences on the underlying offenses in Counts 1, 14-18 and 20-23 would be

---

[8] The trial court did not specifically address the one-year firearm specifications in Counts 1, 14-18 and 20-23 at the sentencing hearing.

served concurrently. The trial court further stated that the sentences on Counts 26-28 "would be served concurrent to one another but consecutive to the other counts." The trial court also imposed postrelease control.

{¶ 76} In its September 17, 2020 sentencing journal entry, the trial court set forth Onaje's sentences as follows:

- As to Count 1: Three years on the firearm specification to be served prior to and consecutive to a minimum prison term of eight years and a maximum prison term of 12 years on the underlying offense.

- As to Counts 14-18 and 20-22: Three years on the firearm specifications to be served prior to and consecutive to eight years on the underlying offenses.

- As to Count 23: Three years on the firearm specification to be served prior to and consecutive to eight years on the underlying offense.

- As to Counts 26-28: 36 months.[9]

The trial court stated that the sentences imposed on Counts 26-28 were to run concurrent to each other and that the sentences imposed on Counts 1, 14-18 and 21-23 were to run concurrent to each other but consecutive to the sentences imposed on Counts 26-28.[10] The trial court also imposed postrelease control.

---

[9] In its September 17, 2020 sentencing journal entry, the trial court did not impose a sentence on the one-year firearm specification in Count 27.

[10] We note that when the individual sentences are added, the aggregate sentence set forth in the trial court's September 17, 2020 sentencing journal entry does not match the aggregate sentence the trial court imposed at the September 8, 2020 sentencing hearing or the aggregate sentence as stated in the trial court's May 20, 2021 journal entry. Because the parties have not raised the issue, we do not address it further here.

## C. Reverse Bindover, Transfer Back to General Division and Invocation of Sentence

{¶ 77} Because Onaje was found not guilty of the attempted murder charges that had mandated bindover, the trial court stayed imposition of his sentence and the case was sent back to the juvenile court, pursuant to a reverse bindover, for further proceedings in accordance with R.C. 2152.121. The state filed a timely notice of objection to the imposition of a serious youthful offender dispositional sentence with the juvenile court and requested that the juvenile court schedule an amenability hearing.

{¶ 78} Onaje filed a notice of appeal. On January 14, 2021, this court dismissed the appeal for lack of a final, appealable order. The court noted that a judgment of conviction is not a final, appealable order until a sentence is imposed and that an adult sentence could not be imposed by the general division until the juvenile court transferred jurisdiction of the case back to the general division.

{¶ 79} On April 16, 2021, the juvenile court conducted an amenability hearing. Following the hearing, the juvenile court found that Onaje was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions. The juvenile court transferred the case back to the general division and, on May 20, 2021, the trial court invoked the previously imposed sentence. The trial court stated, in its May 20, 2021 journal entry:

> Defendant was previously sentenced to aggregate prison term of 21 to 25 years of incarceration. That sentence was stayed for further

proceedings in juvenile court pursuant to ORC 2152.121. The court has received and reviewed the journal entry dated April 26, 2021. Defendant was found not amenable to * * * care or rehabilitation within the juvenile system and that the safety of the community require[s] that the child be subject to adult sanctions. Therefore, the previously imposed sentence shall now be invoked pursuant to ORC 2152.121(B)(3).

{¶ 80} Once again Onaje appealed, raising the following eight assignments

of error for review:

> Assignment of Error I: The Juvenile Division of Common Pleas Court erred when it found probable cause to believe that appellant committed acts alleged in the complaint.
>
> Assignment of Error II: The Juvenile Division of Common Pleas Court abused its discretion and denied the juvenile appellant due process of law where it improperly relinquished jurisdiction by finding he was not amenable to rehabilitation in the juvenile justice system.
>
> Assignment of Error III: The trial court erred when it allowed the state to use preemptory challenges in a racially discriminatory way.
>
> Assignment of Error IV: Appellant was denied his constitutional rights to due process and a fair trial when improper and irrelevant evidence was introduced.
>
> Assignment of Error V: The trial court committed plain error when instructing the jury on Count 1.
>
> Assignment of Error VI: The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29.
>
> Assignment of Error VII: Appellant's convictions are against the manifest weight of the evidence.
>
> Assignment of Error VIII: The trial court erred by applying Reagan Tokes to convictions that pre-date its effective date and because it is unconstitutional and the sentence is contrary to law.

For ease of discussion, we address Onaje's assignments of error out of order.

## II. Law and Analysis

### A. Mandatory Transfer and Probable Cause

{¶ 81} In his first assignment of error, Onaje argues that the juvenile court erred in granting a mandatory transfer of his case to the general division because there was insufficient credible evidence for the juvenile court to find probable cause that Onaje had committed the acts of attempted murder with which he had been charged related to the December 4, 2018 and January 27, 2019 shootings.

{¶ 82} "Juvenile courts possess exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if committed by an adult." *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 11, citing R.C. 2151.23(A). However, under certain circumstances, the juvenile court "has the duty" to transfer a case, or bind a juvenile over, to the adult criminal system where the juvenile may be tried as an adult and face criminal sanctions. *In re M.P.* at ¶ 11, citing R.C. 2152.10, 2152.12. There are two types of transfers under Ohio's juvenile justice system — mandatory transfers and discretionary transfers. *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894, ¶ 10.

{¶ 83} "'Mandatory transfer removes discretion from judges in the transfer decision in certain situations.'" *Id.*, quoting *State v. Hanning*, 89 Ohio St.3d 86, 90, 728 N.E.2d 1059 (2000); R.C. 2152.12(A). "'Discretionary transfer * * * allows judges the discretion to transfer or bind over to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or

appear to be a threat to public safety.'" *D.W.* at ¶ 10, quoting *Hanning* at 90; R.C. 2152.12(B).

{¶ 84} R.C. 2152.12(A)(1)(a)(i) states that when a complaint has been filed alleging that a child is a delinquent child for committing an act that would be aggravated murder, murder, attempted aggravated murder, or attempted murder if committed by an adult, the juvenile court must transfer the case to the general division if (1) the child was 16 or 17 years of age at the time of the act charged and (2) there is probable cause to believe that the child committed the act charged. *See also* Juv.R. 30(B) ("In any proceeding in which transfer of a case for criminal prosecution is required by statute upon a finding of probable cause, the order of transfer shall be entered upon a finding of probable cause."); *In re C.G.*, 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, ¶ 29 ("'If the child is eligible for mandatory bindover and if probable cause exists to believe that the juvenile did commit the acts charged, the only procedural step remaining is for the court to enter the order of transfer.'"), quoting *In re M.P.* at ¶ 11. The transfer of a case under R.C. 2152.12(A) "abates the jurisdiction of the juvenile court with respect to the delinquent acts alleged in the complaint, and, upon the transfer, all further proceedings pertaining to the act charged shall be discontinued in the juvenile court, and the case then shall be within the jurisdiction of the court to which it is transferred as described in [R.C. 2151.23(H)]." R.C. 2152.12(I).

{¶ 85} To establish probable cause in a bindover proceeding, the state must present credible evidence supporting each element of the offense. *State v. Iacona*,

93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001). Probable cause in this context requires "credible evidence that 'raises more than a mere suspicion of guilt'" but does not require evidence of guilt beyond a reasonable doubt. *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, ¶ 10, quoting *Iacona* at 93. In other words, probable cause in this context is "'"a fair probability, not a prima facie showing, of criminal activity."'" *State v. Martin*, 8th Dist. Cuyahoga No. 108996, 2021-Ohio-1096, ¶ 32, quoting *State v. Starling*, 2d Dist. Clark No. 2018-CA-34, 2019-Ohio-1478, ¶ 37, quoting *State v. Grimes*, 2d Dist. Greene No. 2009-CA-30, 2010-Ohio-5385, ¶ 16; *see also In re B.W.*, 2017-Ohio-9220, 103 N.E.3d 266, ¶ 20 (7th Dist.) ("Probable cause is a flexible concept grounded in fair probabilities which can be gleaned from considering the totality of the circumstances."), citing *Iacona* at 93. Probable cause is "'a reasonable ground for belief of guilt.'" *In re B.W.* at ¶ 20, quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). It does not require a showing that a belief is correct or that it is more likely true than false. *In re B.W.* at ¶ 20, citing *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *see also In re J.R.*, 8th Dist. Cuyahoga No. 110241, 2021-Ohio-2272, ¶ 32.

{¶ 86} Onaje contends that there was insufficient credible evidence for the juvenile court to find probable cause to believe that he committed attempted murder on December 4, 2018 or January 27, 2019 because (1) Sanders, who was "facing all of the same charges," was "[t]he only witness with testimony against him," Sanders' "motive to shift blame for the offenses was clear and evidence" and Sanders made

statements implicating Onaje only after Sanders was identified by an eyewitness and arrested, (2) it was Sanders' car that was used in all three incidents, (3) Sanders did not identify Onaje as the shooter in the December 4, 2018 incident and claimed that the shooting was "defensive," (4) Sanders testified that there was no plan to shoot anyone and no discussion about shooting anyone prior to the shootings and (5) no one was hit or injured in the December 4, 2018 or January 27, 2019 incidents. We disagree.

{¶ 87} In considering whether probable cause exists, the juvenile court must "evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by the respondent that attacks probable cause." *Iacona* at 93. However, "while the juvenile court has a duty to assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense," it is "not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 44; *see also In re D.M.* at ¶ 10.

{¶ 88} Because it involves questions of both fact and law, our review of a juvenile court's probable cause determination is mixed. *In re A.J.S.* at ¶ 1, 51. We defer to the juvenile court's determinations regarding witness credibility, reviewing those determinations for abuse of discretion. However, whether the state has presented sufficient evidence to support a finding of probable cause to believe that the juvenile committed the charged act, is a question of law we review de novo,

without any deference to the juvenile court. *In re C.G.*, 2012-Ohio-5286, at ¶ 31; *In re A.J.S.* at ¶ 1, 51.

{¶ 89} At issue here are the charges against Onaje for what would be attempted murder in violation of R.C. 2903.02(A) and 2923.02 if committed by an adult. R.C. 2903.02(A) provides, in relevant part: "No person shall purposely cause the death of another." R.C. 2923.02(A) provides: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

{¶ 90} At this stage of the proceedings, the state was not required to prove the truth of the allegations against Onaje. The state had to present credible evidence showing probable cause supporting each element of the offense charged. Based on the evidence presented at the probable cause hearing, we agree that there was more than a mere suspicion or fair probability that Onaje had committed the acts of attempted murder with which he had been charged.

{¶ 91} As detailed above, Sanders testified that Onaje was the driver of the vehicle at the time of the December 4, 2018 shooting, that the Nicholson brothers had some preexisting "beef" with Ty, that Onaje said, "[t]here go Ty" and that Onaje, as the driver, "sped up" in Sanders' vehicle, thereby enabling Nasim to shoot at the Ford Focus (in which Ty was a passenger) as the Focus turned right, away from Sanders' vehicle. Sanders also identified Onaje as the initial shooter in the January 27, 2019 incident, i.e., that Onaje had leaned out the car window and started

shooting at a sedan with a black Glock firearm after informing the others that he had "seen somebody from 131st." Sanders was a close family member of Onaje and Nasim, who had known them for most of their lives, and his testimony inculpated himself in the crimes.

{¶ 92} Harrigan testified that Sanders' version of events was consistent with what he had learned during the course of his investigation of the incidents and that other witnesses had also identified Onaje as the driver of the vehicle at the time of the December 4, 2018 shooting. Harrigan further testified that the version of events to which Sanders testified at the probable cause hearing was similar to the version of events Sanders had provided when he spoke with police following his arrest — prior to any "deals" — and that even before Sanders spoke with police, he had heard a similar "recitation of the facts" when interviewing Malik Booker, who related "stories about what happened" in connection with these incidents to police that he had allegedly heard from Onaje and Nasim.

{¶ 93} The fact that Sanders was a self-interested witness did not preclude the juvenile court from relying on his testimony in determining whether probable cause existed to believe that Onaje had committed the acts charged. The evidence presented at a probable cause hearing "'does not have to be unassailable' to qualify as credible." *In re B.W.*, 2017-Ohio-9220, 103 N.E.3d 266, at ¶ 21, quoting *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 46; *see also In re J.R.*, 2021-Ohio-2272, at ¶ 41. Likewise, "the state has no burden to disprove

alternate theories of the case at a bindover proceeding." *A.J.S.* at ¶ 61, citing *Iacona*, 93 Ohio St.3d at 96, 752 N.E.2d 937.

{¶ 94} Following a thorough review of the record, we find that the state presented sufficient evidence to support the juvenile court's finding that there was probable cause to believe that Onaje committed acts that would constitute attempted murder as charged in the juvenile court complaint. Accordingly, the juvenile court did not err in granting the state's request for mandatory transfer. Onaje's first assignment of error is overruled.

**B. Use of Peremptory Challenge in Jury Selection**

{¶ 95} In his third assignment of error, Onaje argues that trial court erred in allowing the state to use a preemptory challenge in a racially discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

{¶ 96} In *Batson*, the United States Supreme Court ruled that a state may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial. *Batson* at 89 (Equal Protection Clause of the United States Constitution prohibits the use of peremptory challenges in a discriminatory manner to exclude potential jurors solely on account of their race); *see also Flowers v. Mississippi*, ___ U.S. ___, ___, 139 S.Ct. 2228, 2234, 204 L.Ed.2d 638 (2019); *State v. Hernandez*, 63 Ohio St.3d 577, 581, 589 N.E.2d 1310 (1992). The United States Constitution "'forbids striking even a single prospective juror for

a discriminatory purpose.'" *Foster v. Chatman*, 578 U.S. 488, 499, 136 S.Ct. 1737, 195 L.Ed.2d 1 (2016), quoting *Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

{¶ 97} A three-step test is applied in adjudicating an alleged *Batson* violation. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 50. First, the opponent of a peremptory challenge must make a "'prima facie case of racial discrimination.'" *Id.* at ¶ 50, quoting *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106. The opponent of a peremptory challenge must show that the peremptory challenge was used to remove from the venire a member of a cognizable racial group and that the facts and circumstances raise an inference that the use of the peremptory challenge was racially motivated. *State v. Johnson*, 88 Ohio St.3d 95, 116, 723 N.E.2d 1054 (2000), citing *State v. Hill*, 73 Ohio St.3d 433, 444-445, 653 N.E.2d 271 (1995). With the prima-facie step, the trial court must "consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present." *State v. Kirk*, 2019-Ohio-3887, 145 N.E.3d 1092, ¶ 20, citing *Batson* at 96-97.

{¶ 98} If this requirement is met, then the proponent of the challenge must provide a race-neutral explanation for the use of the peremptory challenge. *Thompson* at ¶ 51, citing *Batson* at 97. At step two of the inquiry, the issue is the "'facial validity of the * * * explanation'" offered for seeking to excuse the jurors.

*Thompson* at ¶ 51, quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). "Although it is not enough to simply deny a discriminatory motive or assert good faith * * *, the 'explanation need not rise to the level justifying exercise of a challenge for cause.'" *Thompson* at ¶ 51, quoting *Batson* at 97. "'Unless a discriminatory interest is inherent in the * * * explanation, the reason offered will be deemed race neutral.'" *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), quoting *Hernandez* at 360.

{¶ 99} Finally, in step three, the court must examine the state's peremptory challenges in context to determine whether the prosecutor's stated reasons were the actual reasons or were, instead, merely a pretext for discrimination. *Flowers,* ___ U.S. at ___, 139 S.Ct. at 2241, 204 L.Ed.2d 638; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65. "'[T]he trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination.'" *Thompson* at ¶ 52, quoting *Bryan* at ¶ 106. As the Ohio Supreme Court explained in *Thompson*:

> The court must "assess the plausibility of" the prosecutor's reason for striking the juror "in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.E.2d 196 (2005). Relevant factors may include "the prosecutor's demeanor; * * * how reasonable, or how improbable, the explanations are; and * * * whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). "In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor * * *, making the trial court's firsthand observations of even greater importance." *Snyder*, 552 U.S. at 477, 128 S.Ct. 1203, 170 L.Ed.2d 175.

*Thompson* at ¶ 52. The "ultimate inquiry" is "whether the State was 'motivated in substantial part by discriminatory intent.'" *Flowers* at 2244, quoting *Foster*, 578 U.S. at 513, 136 S.Ct. 1737, 195 L.Ed.2d 1 (internal quotation marks omitted).

{¶ 100} A trial court's ruling on the issue of discriminatory intent "'must be sustained unless it is clearly erroneous.'" *Flowers* at 2244, quoting *Snyder*, 552 U.S. at 477, 128 S.Ct. 1203, 170 L.Ed.2d 175; *see also State v. Strong*, 8th Dist. Cuyahoga No. 100699, 2015-Ohio-169, ¶ 14, citing *Hernandez*, 63 Ohio St.3d at 583, 589 N.E.2d 1310. "'This deferential standard arises from the fact that step three of the *Batson* inquiry turns largely on the evaluation of credibility by the trial court.'" *State v. Blackshear*, 8th Dist. Cuyahoga No. 108916, 2020-Ohio-3187, ¶ 21, quoting *State v. Moseley*, 8th Dist. Cuyahoga No. 92110, 2010-Ohio-3498, ¶ 35.

{¶ 101} In this case, Onaje asserted a *Batson* challenge to the state's use of its third peremptory challenge to excuse prospective Juror No. 4, an African American male. Prospective Juror No. 4 was the second African American prospective juror excused by the state. The state had used its first peremptory challenge to excuse prospective Juror No. 8, another African American male. The state had used its second peremptory challenge to excuse prospective Juror No. 12, a white female.

{¶ 102} The trial court asked the state to provide a race-neutral explanation for its use of its peremptory challenges. The state indicated that it had excused prospective Juror No. 8 because he had been previously prosecuted twice by the Cuyahoga County Prosecutor's Office. The state indicated that it had excused

prospective Juror No. 12 because "her brother's had a lot of problems with the law in the past." The state indicated that it had used its third peremptory challenge to excuse prospective Juror No. 4 due to (1) his "recent criminal involvement with carrying a concealed weapon," (2) his statement that he knew he needed a concealed carry permit to carry a concealed weapon but "didn't care" and (3) "his demeanor at certain times during [the] proceedings," i.e., pulling "his shirt up over his face" while the assistant prosecutor was talking and "slouch[ing] down and not giving very good eye contact."

{¶ 103} With respect to prospective Juror No. 4's prior carrying-a-concealed-weapon ("CCW") charge, Onaje's counsel responded that prospective Juror No. 4 had acknowledged that it was his fault that he was arrested on the CCW charge, that he had indicated that he was now taking steps to obtain a permit so he could be in compliance with Ohio CCW law and that he had indicated that he could be fair and "judge this case on the facts and the evidence" notwithstanding his prior CCW charge.

{¶ 104} With respect to the state's demeanor arguments, Onaje's counsel disputed the state's claim that prospective Juror No. 4 was not making eye contact and stated that he had made "excellent eye contact" with her. She also asserted that "everybody has a different temperature level that they're comfortable with" and that, in her view, Juror No. 4 "appeared to be cold rather than nonresponsive." After hearing from both parties, the trial court accepted the state's race-neutral

explanations, overruled Onaje's *Batson* challenge and excused prospective Juror No. 4.

{¶ 105} Citing this court's decisions in *Strong*, 2015-Ohio-169, and *Kirk*, 2019-Ohio-3887, 145 N.E.3d 1092, Onaje argues on appeal that "a juror's facial expressions or body language is not always a neutral basis for a peremptory exclusion" and that "the [s]tate's proffered reasons appear to violate *Batson* based on the discrepancy as to whether Juror 4's action of pulling up his coat reflected an inattentive demeanor or was indicative of being cold."

{¶ 106} This case is distinguishable from *Strong* and *Kirk*. In *Strong*, this court held the trial court's decision to overrule a defendant's objection to the use of a peremptory challenge was clearly erroneous where the state's sole proffered reason for excusing the juror was that "[h]e has an extremely wide-eyed look, like he has a thousand-yard stare," giving rise to purported concerns regarding his attentiveness. In that case, the trial court had not observed conduct by the juror consistent with the state's description, the state had not made any inquiry of the juror before concluding the juror could not be attentive solely due to his appearance and defense counsel and the trial court had questioned the juror and the juror had expressly indicated that he possessed no reservations about his ability to serve as a juror, represented that he would listen and pay close attention to the testimony and his responses were appropriate and articulate. *Strong* at ¶ 17-18, 21, 29-30. This court indicated that "it was not the juror's body language that was being questioned but his physical appearance" and that both the trial court and the state had "failed to

sufficiently develop the record or appropriately inquire into the concerns regarding this juror." *Id.* at ¶ 23. The court stated: "'"[T]he state's failure to engage in any meaningful voir dire examination on a subject the state alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."'" *Id.*, quoting *Dretke*, 545 U.S. at 246, 125 S.Ct. 2317, 162 L.Ed.2d 196, quoting *Ex parte Travis*, 776 So.2d 874, 881 (Ala. 2000).

{¶ 107} In *Kirk*, the state's exercise of its seven peremptory challenges resulted in the removal of four African American individuals as jurors. *Kirk* at ¶ 36. After the fourth prospective African American juror was removed from the jury, defense counsel raised a *Batson* challenge. *Id.* The state's proffered "race-neutral" reason for excusing the prospective juror was its perception that the prospective juror was untruthful based on (1) his body posture, i.e., that the prospective juror "had angled his body * * * in a way that the State found he was not being fully honest with the State when questioned," and (2) that the prospective juror had "up stat[ed] [his] job," i.e., stating that he was an "engineer" when, based on his description of his job duties and responsibilities, he "was really a maintenance man." *Id.* at ¶ 41, 48. Considering the exclusion of the prospective juror "in the context of all the facts and circumstances," including that there was nothing in the record to indicate that the prospective juror "would be an inattentive juror, a biased juror, or an untruthful juror," the state's failure to make any inquiry of the "specific body language" or the truthfulness of this juror before excluding this prospective juror from the panel and the state's prior exclusion of three other prospective African American jurors, the

court found "a pattern of racially motivated removals of the prospective African-American jurors when the four peremptory challenges are examined together" and that the trial court had erred in ruling that the state's peremptory strike of the fourth prospective African American juror was not motivated in substantial part by discriminatory intent. *Id.* at ¶ 37-44, 48-53.

{¶ 108} In this case, the primary reason the state indicated it sought to excuse prospective Juror No. 4 was his prior CCW charge and his knowing disregard of the law regarding CCW permit requirements. This case involved numerous charges of violent offenses resulting from the use of firearms. Prospective Juror No. 4 had been charged with a CCW offense in the past year. He indicated that he had been carrying the firearm for protection and that although, at the time, he knew that he needed a permit to carry a concealed weapon, he did not think he should have to have a permit based on his Second Amendment "right to bear arms" and "didn't care" about complying with the law.

{¶ 109} Further, it was not the prospective juror's physical features or physical characteristics that was cause for the state's concern here, rather, it was his actions, i.e., pulling his shirt up over his head while the assistant prosecutor was talking — which the trial judge indicated she had personally observed.[11] The fact that prospective Juror No. 4 allegedly made "excellent eye contact" with defense

---

[11] Although Onaje asserts, in his brief, that the prospective juror's action of "pulling up his coat" should be regarded as a sign that he was cold rather than that he was inattentive, it was the prospective juror's act of "pulling his shirt up over his face" while the assistant prosecutor was talking that was a stated reason for excusing prospective Juror No. 4, not his actions in "pulling up his coat."

counsel would not necessarily ameliorate the state's concern regarding the prospective juror's refusal to make eye contact with the assistant prosecutor, particularly where, as here, the prospective juror was pulling his shirt up over his face while the assistant prosecutor was talking.

{¶ 110} Onaje also asserts that the trial court erred in overruling his *Batson* challenge because the state treated African American potential jurors who had a criminal history differently than it treated a similarly situated white prospective juror. He contends that although the state had asked African American jurors with prior criminal involvement whether they could be "fair and impartial" despite their prior criminal involvement, he did not ask a white prospective juror (Juror No. 6) who had a prior marijuana charge "whether she could be fair despite her prior criminal involvement."

{¶ 111} "Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred" and "can suggest that the prosecutor's proffered explanations for striking black prospective jurors were a pretext for discrimination," *Flowers*, ___ U.S. at ___, 139 S.Ct. at 2248-2249, 204 L.Ed.2d 638. However, the record does not support such a conclusion in this case.

{¶ 112} During voir dire, prospective Juror No. 6 disclosed that she had been previously convicted of a marijuana charge for which she received probation. The record reflects that the state did not specifically ask prospective Juror No. 6 whether she could be "fair and impartial" despite her criminal history, as it did prospective

Juror No. 4, with respect to his prior CCW charge and beliefs relating to CCW permits and prospective Juror No. 8, with respect to his prior guilty plea and six-year sentence for manslaughter. However, the record reflects that when the trial court initially questioned prospective Juror No. 6 regarding her prior marijuana conviction, she stated: "It was fine. * * * I felt like I was treated fairly and everything was taken care of." The record further reflects that prospective Juror No. 6 responded affirmatively when the trial judge asked all of the prospective jurors: "[D]o you all feel that you could be fair to both the State of Ohio and the two defendants in this matter?" The state also questioned prospective Juror No. 6 regarding her views about firearms and violence and her ability to be a fair and impartial juror as it related to an incident that had occurred four days earlier when a close coworker was shot nine times after he accidently bumped into someone getting on the bus:

> [THE STATE]: Do you think that that experience, the fact that you have a friend who's a victim in a shooting case might affect your ability to be fair and impartial in this case? * * *
>
> JUROR NO. 6: I don't know. I have my own like thoughts and opinions about guns and violence and I just don't — I don't see a need for it, but I don't know. I think I'll be fair.
>
> [THE STATE]: Okay. So you do have strong feelings about guns, that they're just a bad idea in general?
>
> JUROR NO. 6: Yeah. Pretty much.
>
> [THE STATE]: We don't have to get into the whole Second Amendment thing, but do you believe you can be fair and impartial you said?

JUROR NO. 6: Yeah. Yeah.

{¶ 113} The record does not reflect the race or ethnicity of most of the other jurors or prospective jurors. However, the record reflects that the state did not ask prospective Juror No. 5, who was identified on the record as an African American male, about his ability to be fair and impartial based on his conviction for receiving stolen property 40 years earlier.

{¶ 114} The trial court was in the best position to weigh the credibility of the state's explanations in determining whether the state exercised its peremptory challenges with a discriminatory intent. Following a thorough review of the record, we cannot say that the trial court's decision to allow the state to exercise a peremptory challenge to excuse prospective Juror No. 4 was clearly erroneous. Onaje's third assignment of error is overruled.

## C. Admission of Codefendant's Statement

{¶ 115} In his fourth assignment of error Onaje contends that he was prejudiced by the admission of "improper and irrelevant evidence" at trial, specifically comments Nasim made during a police interview relating to Nasim's involvement in an unrelated homicide case.

{¶ 116} During the testimony of Harrigan, the state played a redacted version Nasim's post-arrest videotaped interview with Harrigan, conducted on June 26, 2019. During that interview, Harrigan questioned Nasim about several different incidents, including incidents that are not part of this case. The portion of the videotaped interview played for the jury included comments by Nasim to the

detective regarding an unrelated homicide case to the effect that Nasim was feeling bad about something and that he wished he could speak to the family ("Nasim's comments").[12]

{¶ 117} Prior to trial, the parties agreed that the portions of the interview relating to the unrelated homicide and "other law enforcement involvement" relating to Nasim would be redacted from the video and not played at trial. The state thereafter conferred with Onaje's counsel and Nasim's counsel regarding the interview, identifying the portions of the interview the state intended to play for the jury and giving defense counsel an opportunity to request additional redactions beyond the redactions already identified by the state. At that time, Onaje's counsel did not request redaction of the specific portion of the video interview at issue here.

{¶ 118} After that portion of the video was played for the jury, a sidebar was held and the trial court dismissed the jury for the day so that the parties and the trial court could further discuss the issue. Onaje's counsel objected to the state playing that portion of the videotaped interview, asserting that the parties had agreed that nothing would be mentioned in this case regarding Nasim's unrelated homicide case and counsel also objected to the trial court's dismissal of the jury for the day without having first providing a curative instruction. Nasim's counsel joined in the objection relating to the portion of the video that included Nasim's comments and agreed that

---

[12] In his appellate brief, Onaje does not quote or otherwise identify the specific comments by Nasim that he contends were prejudicial and should have been excluded. The audio on the video is somewhat difficult to hear, but it appears that the comments at issue were as follows: "I ain't never bragged, posted about that s***. * * * I lightweight want to speak to the family, and I can't even do that s***."

there was a need for a curative instruction but stated that she wanted "to be careful as to how we make a curative instruction * * * to craft it in such a way that it is not in any way an admission, it is not characterized as an admission, and it has nothing to do with any of the situation."

**{¶ 119}** The trial court directed the parties to "come up with an agreeable curative instruction" regarding that part of the interview and offered to give a curative instruction to the jury the following morning. However, the trial court did not ultimately give a curative instruction the following morning. The following morning, before the continuation of the video and Harrigan's testimony, the parties advised the trial court that they had been discussing a possible curative instruction.

**{¶ 120}** Nasim's counsel stated that she thought

we should give a general curative instruction at the time that you give the jury charge, not now, that generally would say — comment again on the fact that there's silent parts for evidentiary reasons that have nothing to do with this case, and again say you've heard things that may be said about other events. You're directed to disregard anything that doesn't have to do with the charges of this case. That would be something — and then it doesn't overemphasize and it's taken at the same time when they're giving instructions.

**{¶ 121}** Onaje's counsel indicated that she had "a strong objection to that" and explained:

I'm concerned about the statement by Nasim that he says this is weighing heavily on me, I feel so bad about it, I wish I could talk to the family. From my perspective, that clearly says to the jury that whatever he's feeling bad about he can't talk to the person that he feels bad about and he has to talk to the family.

THE COURT: Because he's dead.

[ONAJE'S COUNSEL]: Yeah. That's what I think. For me it's just my perspective that when people say that I would love to talk to the family or express remorse to the family that that clearly sends a signal to the jury that someone is deceased. I think that because they're sitting at the table together if they look and think that Nasim is the cause of somebody being deceased that that prejudicial thinking will spill over to my client and so I would like a curative instruction that relates to that particular part.

The state indicated that it was "fine with whatever curative instruction the Court determines to be the best for the jury."

{¶ 122} Onaje's counsel initially expressed what she would like to see in a curative instruction as follows:

I think what I would like to say is the defendants or Nasim's statement, that he feels very bad and he would like to speak to the family or he would love to talk to the family but he can't — I'm paraphrasing — * * * has nothing to do with any matters in this case, any of the parties in this case whatsoever.

{¶ 123} Nasim's counsel indicated that she objected to this proposed curative instruction. The trial court asked Onaje's counsel for a written proposed curative instruction and agreed to give her proposed curative instruction:

THE COURT: And so, [Onaje's counsel], did you say you have a curative instruction?

[ONAJE'S COUNSEL]: Yes, your Honor. I said it to you.

* * *

THE COURT: I mean, do you have a written —

[ONAJE'S COUNSEL]: I didn't write it down because I know it. I've been saying it a lot. Nasim's statement that he feels very badly about this and it's weighing heavily on his mind and he wished that he could speak to the family —

THE COURT: Should be disregarded?

[ONAJE'S COUNSEL]: And that they have nothing to do with any of the parties in this case or the events for which we're trying in this case.

THE COURT: All right. I will give that instruction. If you would type it up as you would like it to be read, show it to [Nasim's counsel], show it to the prosecutors, and I will do it at the time of the general instructions.

{¶ 124} At the conclusion of the trial, Onaje's counsel submitted a revised written curative instruction to the trial court. After the trial court made "some grammatical corrections," it read: "Any reference to feeling badly and desiring to speak to someone's family has nothing to do with any of the parties in this case or any of the parties for which the defendants or defendant Onaje Nicholson is being charged." The other parties suggested a couple of minor changes to the curative instruction proposed by Onaje's counsel, which were agreed upon, and the trial court read the modified curative instruction to the jury at the conclusion of the jury charge. The curative instruction read to the jury stated:

> Any reference to feeling badly and desiring to speak to someone's family has nothing to do with any of the parties in this case or any of the matters before you.

{¶ 125} Onaje contends that this curative instruction was "inadequate" because it was given "only as part of the court's overall instructions to the jury and not in specific reference to the prejudicial statement" and because "[t]he jury was never informed to disregard Nasim's statement or instructed that it related to events not involved in this case."

{¶ 126} In *State v. Nicholson*, 8th Dist. Cuyahoga No. 110522, 2022-Ohio-374, this court considered the admission of Nasim's comments as it related to Nasim's conviction for participating in a criminal gang. In that case, despite Nasim's assertion that he was unfairly prejudiced by the admission of improper evidence and the "damaging curative instruction," this court found no reversible error. *Id.* at ¶ 51-59. A similar conclusion is warranted in this case.

{¶ 127} The record reflects that, although Onaje's counsel was provided, prior to trial, with information regarding the portions of the videotaped interview the state had redacted and was given the opportunity to request additional redactions of videotaped interview, Onaje's counsel did not ask the state to redact that specific portion of Nasim's interview to which Onaje now objects. "'The defense cannot invite error and later complain about its prejudicial effect on appeal.'" *Id.* at ¶ 57, quoting *State v. Spirko*, 59 Ohio St.3d 1, 8, 570 N.E.2d 229 (1991). Further, Onaje's counsel did not object to the language of the curative instruction before it was given to the jury. Onaje's counsel was the person who drafted the curative instruction given by the trial court.

{¶ 128} Finally, Onaje has not shown that he was prejudiced by the introduction of these comments. Onaje asserts that Nasim's comments were at least "equally prejudicial to Onaje (who was accused of being present)" and "possibly more prejudicial to him because it possibly made Nasim seem more sympathetic." We disagree. Onaje was not mentioned in Nasim's comments, and no evidence was introduced or any argument made at trial to suggest that Onaje had any involvement

in that unrelated homicide. Nasim's comments did not identify any specific facts or names, and no other mention was made of Nasim's comments during the trial. The jury was not otherwise informed of the separate homicide with which Nasim had been charged or provided any information regarding that incident. There is nothing in the record to suggest that Nasim's comments in any way related to Onaje or affected the jury's verdict against Onaje. The jury did not convict Onaje of all charges and, in particular, found Onaje not guilty of the attempted murder charges. As detailed elsewhere in this opinion, ample evidence supported Onaje's convictions on the charges for which the jury found Onaje guilty. Accordingly, Onaje's fourth assignment of error is overruled.

## D. Jury Instructions

{¶ 129} In his fifth assignment of error, Onaje argues that the trial court failed to properly instruct the jury on Count 1. In Count 1, the defendants were charged with participating in a criminal gang from "[o]n or about August 1, 2018 to June 19, 2019" as follows:

> [Onaje, Nasim and Sanders] did actively participate in a criminal gang, with knowledge that the criminal gang engages in or had engaged in a pattern of criminal gang activity, and did purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or did purposely commit or engage in any act that constituted criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, to wit: Attempted Murder, RC 2923.02/RC 2903.02 and/or Aggravated Robbery, RC 2911.01 and/or Robbery, RC 2911.02 and/or Felonious Assault, RC 2903.11 and/or Improper Discharge into a Habitation, RC 2923.161 and/or Discharge Over a Roadway, RC 2923.162 and/or Improperly Handling of [a] Firearm, RC 2923.16.

**{¶ 130}** As to Count 1, the trial court instructed the jury, in relevant part:

Count 1. Participating in a criminal gang. Defendants Onaje Nicholson and Nasim Nicholson are charged in Count 1 of the indictment with participating in criminal gang activity in violation of 2923.42(A). * * * Before you can find the defendants guilty of participating in a criminal gang, you must find beyond a reasonable doubt that on or about the 1st day of August 2018, to the 19th day of June 2019, in Cuyahoga County, Ohio, the defendants did actively participate in a criminal gang with knowledge that the criminal gang engages in or had engaged in a pattern of criminal gang activity and did purposely promote, further, or assist any criminal conduct, or did purposely commit or engage in any act that constituted criminal conduct, to wit, attempted murder, Revised Code Section 2923.02, Revised Code Section 2903.02, and/or aggravated robbery, Revised Code Section 2911.01; and/or robbery, Revised Code Section 2911.02; and/or felonious assault, Revised Code Section 2903.11; and/or improper discharge into a habitation, Revised Code Section 2923.161; and/or discharge over a roadway, Revised Code Section 2923.162; and/or improper handling of a firearm, Revised Code Section 2923.62.

* * *

If you find the state proved beyond a reasonable doubt each and every one of the essential elements of the offense of participating in a criminal gang as charged in Count 1 of the indictment, your verdict must be guilty according to your findings. You will then indicate your finding on the verdict form.

If you find the state failed to prove beyond a reasonable doubt any one or more of the essential elements of the offense of participating in a criminal gang as charged in Count 1 of the indictment, your verdict must be not guilty according to your findings. You will then indicate the finding on the verdict form.

In instructing the jury on Count 1, the trial court also defined criminal gang, pattern of criminal activity, criminal conduct, knowledge, knowingly, purpose, purposely and juvenile and, in connection with other counts, identified the elements necessary to prove felonious assault, improper discharge into a habitation, discharge of a firearm on or over a public road or highway and improper handling of a firearm.

{¶ 131} Onaje did not object to the trial court's jury instructions on Count 1 below. Onaje, nevertheless, argues on appeal that the trial court erred in instructing the jury that it could find that Onaje had participated in a criminal gang by engaging in conduct that constituted aggravated robbery, robbery and/or discharge over a roadway because (1) there was no evidence of aggravated robbery or robbery in this case and (2) the trial court did not provide instructions defining aggravated robbery, robbery or discharge over a roadway.

{¶ 132} Crim.R. 30(A) states, in relevant part: "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Under Crim.R. 52(B), however, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

{¶ 133} Plain error is an obvious error or defect in the trial court proceedings that affects a substantial right. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Plain error requires a showing that there was an error, that the error was plain or obvious, that but for the error the outcome of the proceeding would have been otherwise and that reversal is necessary to correct a manifest miscarriage of justice. *State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, 164 N.E.3d 294, ¶ 7, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. The party asserting plain error "bears the burden

of proof to demonstrate plain error on the record." *Rogers* at ¶ 22, citing *Quarterman* at ¶ 16.

{¶ 134} In support of his assignment of error, Onaje simply asserts that the trial court's "defective jury instruction" constituted plain error because it "confused the jury and contributed to a guilty verdict against Onaje" on Count 1. Onaje does not, however, explain how the alleged "defects" in the jury instruction "confused" the jury or "contributed to a guilty verdict" against Onaje, and he does not point to anything in the record that suggests that the jury was confused by the jury instruction or that the jury instruction otherwise improperly contributed to a guilty verdict against Onaje on Count 1.

{¶ 135} This court may "decline to address summary conclusions presented as arguments." *State v. Ladson*, 8th Dist. Cuyahoga No. 104642, 2017-Ohio-7715, ¶ 19-20. An appellant's brief must include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." App.R. 16(A)(7). An appellate court is not obliged to construct or develop arguments to support a defendant's assignment of error and "'will not "guess at undeveloped claims on appeal."'" *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 56 (8th Dist.), quoting *State v. Piatt*, 2020-Ohio-1177, 153 N.E.3d 573, ¶ 39 (9th Dist.), quoting *McPherson v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21499, 2003-Ohio-7190, ¶ 31; *see also State v. Collins*, 8th Dist. Cuyahoga No. 89668,

2008-Ohio-2363, ¶ 91 ("'[I]t is not the duty of this Court to develop an argument in support of an assignment of error if one exists.'"), quoting *State v. Franklin*, 9th Dist. Summit No. 22771, 2006-Ohio-4569, ¶ 19.

{¶ 136} Onaje's generalized assertion that the trial court's "defective jury instruction" constituted plain error because it "confused the jury" and "contributed to a guilty verdict against Onaje" — without any explanation, citation to the record or citation to legal authorities in support of such claims — does not satisfy Onaje's obligations under App.R. 16(A)(7). Even if we were to consider the issue, we would find that Onaje has not established plain error.

{¶ 137} In considering a claim of plain error based on defective jury instructions, "an appellate court must review the [jury] instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions." *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45, ¶ 17. An improper or erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial would clearly have been different. *State v. Davis*, 8th Dist. Cuyahoga No. 109890, 2021-Ohio-2311, ¶ 30, citing *State v. Cooperrider*, 4 Ohio St.3d 226, 448 N.E.2d 452 (1983).

{¶ 138} As this court observed in *Nicholson*, 2022-Ohio-374 — when considering a similar assignment of error Nasim raised in his direct appeal — in this case, because no evidence of aggravated robbery or robbery was introduced at trial, there was no error in the trial court's failure to instruct on the elements of these

offenses. *Id.* at ¶ 40.[13] Indeed, under the circumstances, any specific instructions regarding those offenses would have been improper. *Id.,* citing *State v. Sims*, 11th Dist. Lake No. 2001-L-081, 2003-Ohio-324, ¶ 60 ("The trial court may not instruct a jury where there is no evidence to support a particular issue.").

{¶ 139} Furthermore, as charged, the jury could have found that the state presented sufficient evidence of this element if the state proved, beyond a reasonable doubt, that Onaje purposely promoted, furthered, assisted, committed or engaged in "any act that constituted criminal conduct, to wit: attempted murder * * * and/or aggravated robbery * * * and/or robbery * * * and/or felonious assault * * * and/or improper discharge into a habitation * * * and/or discharge over a roadway * * * and/or improper handling of a firearm." Thus, there was no requirement that the jury find that Onaje had committed or engaged in aggravated robbery or robbery to find him guilty of participating in a criminal gang, the jury was not instructed that there was such a requirement and there is nothing in the record to suggest that the jury's guilty finding on Count 1 was due to confusion resulting from the trial court's jury instructions. In this case, based on the substantial evidence presented by the state, the jury found Onaje guilty of eight counts of felonious assault, two counts of improper discharge into a habitation and one count of discharge of a firearm upon or over a public road or highway in connection with the January 29, 2019 incident. The jury also found Onaje not guilty of many other offenses. Because Onaje has not

---

[13] Contrary to Onaje's assertions, the trial court did instruct the jury regarding discharge over a roadway and, in fact, the jury found Onaje guilty of Count 25.

demonstrated that the trial court's reference to, or failure to instruct on the elements of, aggravated robbery or robbery affected the jury's verdict in any way, he has not established plain error. *See, e.g., State v. Coe*, 5th Dist. Stark No. 2009 CA 00050, 2010-Ohio-1840, ¶ 94-99 (trial court did not commit plain error in including kidnapping in the list of acts constituting criminal conduct under R.C. 2923.41 when instructing the jury on the offense of participating in a criminal gang where, based on the evidence of defendant's guilt in this record, court could not say that a reasonable probability existed that defendant would have been acquitted had the trial court provided the jury with an instruction that did not include kidnapping). Onaje's fifth assignment of error is overruled.

### E. Sufficiency of the Evidence

{¶ 140} In his sixth assignment of error, Onaje argues that the trial court erred in denying his Crim.R. 29(A) motion for acquittal as to all charges.

{¶ 141} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Crim.R. 29(A) mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. Crim.R. 29(A) (the trial court "shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses"); *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21. Accordingly, we apply the same standard of review to a trial court's denial of a defendant's motion for acquittal as we use when reviewing sufficiency of the

evidence. *Id.* at ¶ 21-23 ("Crim.R. 29(A) and sufficiency of evidence review require the same analysis."), citing *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571.

{¶ 142} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541. Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 143} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *Id.*; *see also State v. Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). The appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 144} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g., State v. Wells*, 8th Dist. Cuyahoga No. 109787, 2021-Ohio-2585, ¶ 25, citing *State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.'" *Wells* at ¶ 25, quoting *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence is "evidence that requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Wells* at ¶ 25, quoting *Cassano* at ¶ 13; *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[C]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind."). Circumstantial evidence and direct evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12.

### 1. Felonious Assault and Gun-Related Offenses

{¶ 145} In connection with the January 29, 2019 shooting, Onaje was convicted of eight counts of felonious assault in violation of R.C. 2903.11(A)(2), two counts of discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1), one count of discharge of firearm on or near prohibited premises in

violation of R.C. 2923.162(A)(3) and various associated firearm specifications.[14] Onaje contends that the state failed to present sufficient evidence to support his convictions on these offenses because (1) most of the victims of the felonious assault counts did not testify and there was, therefore, "insufficient evidence from which to conclude that they were even present at the time of the incident," (2) the police "interviewed" only two of the victims from the January 29, 2019 incident, i.e., Maxine Fuller and Ashley Brooks, (3) there was no physical evidence, e.g., DNA or fingerprints, linking Onaje to the shooting, (4) the gun recovered by police on February 27, 2019 was not connected to any of the spent shell casings found at the scene, (5) Horton (the victim of the January 27, 2019 incident) testified that the shooter was in the backseat whereas Sanders testified that Onaje was in the front passenger seat and (6) there was "nothing linking Onaje to the scenes of [the] incidents besides Sanders."

{¶ 146} The felonious assault statute, R.C. 2903.11(A)(2), states, in relevant part: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2923.161(A)(1) states: "No person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or

---

[14] Other than to assert that there was insufficient evidence to establish that he was involved in the January 29, 2019 shooting and that, therefore, there was insufficient evidence to support his conviction on any "gun-related offenses," Onaje does not argue that there was insufficient evidence to support his conviction on Count 25 for discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) or any of the firearm specifications of which he was convicted. Accordingly, we do not separately address those convictions here.

temporary habitation of any individual." A person acts knowingly "when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 147} Following a thorough review of the record, we conclude that the state presented sufficient evidence for a reasonable jury to find Onaje guilty of each of these offenses beyond a reasonable doubt and that the trial court, therefore, did not err in denying his Crim.R. 29(A) motion as to those offenses.

{¶ 148} A conviction may rest solely on the testimony of a single witness, if believed. *See, e.g., State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38; *State v. Dudley,* 9th Dist. Summit No. 28364, 2017-Ohio-7044, ¶ 10. In this case, Onaje's convictions on Counts 14 and 16-25 were supported by the testimony of multiple witnesses and other evidence.

{¶ 149} Contrary to Onaje's assertion, there is no requirement that the victim must testify at trial to support a conviction for felonious assault or discharging a firearm at or into a habitation. The January 29, 2019 shooting occurred before 5 a.m., when many, if not all of the victims, were still sleeping. During her trial testimony, Brooks identified each of the individuals who were in her home at the time of the shooting. Three of the victims were Brooks' young children, who were ages 4, 5 and 6 at the time of the shooting. As such, they could not reasonably be expected to testify at trial. Officer Carmine, one of the responding officers, likewise identified each of the victims and testified that he made contact with the adult victims who had been in Brooks' house at the time of the shooting,

including Brooks, her brother, Philpotts, Jones and Jackson. He testified that he also spoke with Fuller regarding the bullet that was shot at her home. Officer Carmine stated that most of the victims told him that they were unaware that shots had been fired at the house. Accordingly, there may have been limited relevant testimony they could have offered at trial regarding the incident. Officer Carmine also identified photographs, which were admitted into evidence, that showed where bullets struck Brooks' and Fuller's residences during the shooting. This evidence was sufficient to identify the victims in Counts 14 and 16-22 and to establish the discharge of a firearm at or into Brooks' and Fuller's residences in Counts 23-24.

{¶ 150} With respect to Onaje's role in the January 29, 2019 shooting, Sanders testified that during the early morning of January 29, 2019, Onaje drove his car to Cato Street in Maple Heights and identified a house as "Yelly's house" (which was also Brooks' house). He stated that Onaje drove the car around the corner, parked the car and that Onaje and Nasim then got out of the car and ran toward Yelly's house. Sanders testified that he heard approximately ten gunshots fired after which Onaje and Nasim ran back to the car. Officer Carmine testified that, when he arrived on scene, he observed "[t]wo very distinctive groupings" of shell casings a couple feet apart, as well as multiple bullet homes in the front of and inside Brooks' house and a bullet hole inside the neighboring house owned by Fuller.

{¶ 151} Brooks testified that she believed Onaje was involved in the shooting because she had been "having issues" with Onaje on social media and Onaje had

included her address in a post from his Instagram account along with other threatening posts, prior to the shooting.

{¶ 152} Onaje's involvement in the January 29, 2019 shooting was further substantiated by his response to texts he received from Sanders the afternoon following the shooting. When Sanders texted Onaje and informed him that "[o]ne of y'all grazed a baby," Onaje did not dispute his involvement in the shooting. Instead, he inquired how Sanders knew this had occurred. After Sanders told Onaje, "Puff called and said they posted it on [Facebook]," once again, Onaje did not dispute his involvement in the shooting and simply replied, "Bet," i.e., "ok."

{¶ 153} The lack of DNA or fingerprint evidence on the gun recovered by police on February 27, 2019 or otherwise connecting Onaje to the January 29, 2019 shooting does not preclude a determination that Onaje's convictions on Counts 16, 18-25 were supported by sufficient evidence. DNA or fingerprint evidence is not required to sustain a conviction. *See, e.g., State v. Wells*, 8th Dist. Cuyahoga No, 98388, 2013-Ohio-3722, ¶ 131 (fact that defendant's DNA was not found at the crime scene was "not fatal to the state's case" because "the state was not required to provide DNA or fingerprint evidence linking [defendant] to the crime"); *State v. English*, 1st Dist. Hamilton No. C-180697, 2020-Ohio-4682, ¶ 29 (the state was not required to present DNA evidence connecting defendant to the crime or to recover the murder weapon from him to meet its burden of proof); *cf. State v. Marneros,* 8th Dist. Cuyahoga No. 109258, 2021-Ohio-2844, ¶ 39 ("[F]ingerprint or DNA testing is not required to prove a defendant's possession of a firearm."); *see also Hill*, 2013-Ohio-

578, at ¶ 16 ("Physical evidence is not required to sustain a conviction."), citing *State v. Lopez*, 8th Dist. No. 94312, 2011-Ohio-182, ¶ 62. Detective Ponyicky testified that the shell casings from the shooting incidents were not submitted for fingerprint or DNA analysis due to the belief that any fingerprints or DNA would have been "burnt off" once the bullets were fired. Further, although the gun used in the January 29, 2019 shooting was not recovered by police and the gun recovered by police on February 27, 2019 was not connected to any of the spent shell casings recovered at the scene of the January 29, 2019 incident, Koeth testified that the .40-caliber cartridge cases recovered from the scene of the January 27, 2019 shooting and the .40-caliber cartridge cases recovered from the scene of the January 29, 2019 shooting were fired from the same Glock firearm. Sanders testified that Onaje had used a black Glock firearm during the January 27, 2019 shooting.

{¶ 154} Based on the evidence presented by the state, a jury could have reasonably found, in connection with the January 29, 2019 shooting, that Onaje knowingly attempted to cause physical harm to another by means of a deadly weapon in violation of R.C. 2903.11(A)(2); that Onaje knowingly, without privilege, discharged a firearm at or into Brooks' and Fuller's occupied residences in violation of R.C. 2923.161(A)(1); and that Onaje discharged a firearm on or over a public road or highway, creating a substantial risk of physical harm to any person, in violation of R.C. 2923.162(A)(3), along with the associated firearm specifications. Accordingly, the trial court did not err in denying Onaje's Crim.R. 29(A) motion as to Counts 16, 18-25.

## 2. Participating in a Criminal Gang

{¶ 155} Onaje was also convicted of participating in a criminal gang from on or about August 1, 2018 to June 19, 2019 in violation of R.C. 2923.42(A). R.C. 2923.42(A) states:

> No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.

To support a conviction of participating in a criminal gang under R.C. 2923.42(A), the state must prove four elements beyond a reasonable doubt: (1) the existence of a criminal gang, (2) the defendant's active participation in the gang, (3) the defendant's knowledge that the gang engages in or has engaged in a pattern of criminal gang activity and (4) the defendant's purposeful promotion, furtherance, assistance or commission of, or engagement in any "criminal conduct" as defined in R.C. 2923.41(C). *Nicholson*, 2022-Ohio-374, at ¶ 20, citing *State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 72. Following a thorough review of the record, we conclude that the state presented evidence, if believed, that would establish each of the elements necessary for conviction of Onaje under R.C. 2923.42(A) beyond a reasonable doubt.

## a. The Real Shooters as a Criminal Gang Engaging in a Pattern of Criminal Gang Activity

{¶ 156} Under R.C. 2923.41(A), a "criminal gang" is defined as "an ongoing organization, association or group of three or more persons," who individually or collectively engage in or have engaged in a pattern of criminal gang activity, and that (1) has as one of its primary activities the commission of one or more specified offenses and (2) has a common name or one or more common identifying signs, symbols or colors. A "pattern of criminal gang activity" means that "persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, or be in complicity in the commission of two or more" specified offenses. R.C. 2923.41(B)(1). The specified offenses include felonies or an act committed by a juvenile that would be a felony if committed by an adult and an offense of violence or an act committed by a juvenile that would be an offense of violence if committed by an adult. R.C. 2923.41(B)(1)(a)-(b). A "pattern of criminal gang activity" exists if (1) at least one of the specified offenses is a felony, (2) at least one of the specified offenses occurred on or after January 1, 1999, (3) the most recent of the specified offenses occurred within five years of another of the specified offenses and (4) the specified offenses are committed on separate occasions by two or more persons. R.C. 2923.41(B)(2).

{¶ 157} Onaje argues that the state failed to establish the existence of a criminal gang because (1) none of the social media posts introduced by the state

contained the words "Real Shooters," (2) the Instagram screenshots introduced by the state "did not establish a gang or that the people on them were organized for the purpose of committing criminal offenses," (3) no colors were identified with the Real Shooters, (4) police identified only two items of clothing they associated with the Real Shooters and (5) Sanders denied being part of a gang and was present for all of the alleged shootings. We disagree.

{¶ 158} As detailed above, Harrigan and Sergeant Johnson testified at length regarding their investigation into the Real Shooters. The officers testified that the Real Shooters operated in the area of East 116th Street between Kinsman Road and Buckeye Road and that there were at least six members of the Real Shooters gang, including Onaje, Nasim, Sanders, Malik Booker and Puff. Harrigan and Sergeant Johnson also testified that members of the Real Shooters could be identified by (1) members' social media postings displaying their repeated and deliberate use of unique hand signs, posing with firearms and/or using other text, numerical or graphic symbols representing gang membership, (2) members' use of the identifying mark of "rs" in their Instagram user names and (3) the wearing of apparel with Real Shooters insignia on it.

{¶ 159} In resolving Nasim's direct appeal, this court found that the state presented sufficient evidence to establish that the Real Shooters was a criminal gang that engaged in a pattern of criminal gang activity, i.e., engaging in three separate shooting incidents within a short period of time. *Nicholson*, 2022-Ohio-374, at ¶ 22. Since Onaje and Nasim were tried together, the same evidence the court relied upon

in reaching those conclusions in *Nicholson* also exists in the record in this case. Accordingly, we find, as this court did in *Nicholson*, that the state introduced sufficient evidence to prove that the Real Shooters is a "criminal gang" under R.C. 2923.41(A) and engaged in a pattern of criminal gang activity. *See also State v. Brown*, 6th Dist. Lucas No. L-20-1110, 2021-Ohio-4034, ¶ 44-45.

### b. Onaje's Active Participation in the Real Shooters, Knowledge of a Pattern Criminal Gang Activity and Criminal Conduct

{¶ 160} The record also contains sufficient evidence to support the determination that Onaje was an active participant in the Real Shooters criminal gang, that he did so with the knowledge that Real Shooters engages in or has engaged in a pattern of criminal gang activity and that he purposely promoted, furthered, assisted or engaged in criminal conduct as defined in R.C. 2923.41(C).

{¶ 161} "'[T]he active participation element of the criminal gang statute requires the state [to] demonstrate that appellant actually — not just nominally — took part in the criminal gang.'" *Nicholson* at ¶ 23, quoting *State v. Smith*, 6th Dist. Lucas No. L-15-1027, 2017-Ohio-776, ¶ 38. "'"Actual participation requires that the appellant perform 'some role to benefit the gang.'"'" *Nicholson* at ¶ 23, quoting *State v. Roberson*, 2017-Ohio-4339, at ¶ 76, quoting *Smith* at ¶ 39; *see also Brown* at ¶ 47.

{¶ 162} "Criminal conduct" means "the commission of, an attempt to commit, a conspiracy to commit, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of" certain offenses specified in R.C.

2923.41(B)(1)(a)-(c) or "an act that is committed by a juvenile and that would be an offense, an attempt to commit an offense, a conspiracy to commit an offense, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of" certain offenses specified in R.C. 2923.41(B)(1)(a)-(c) "if committed by an adult."  R.C. 2923.41(C).  Such offenses include acts committed by a juvenile that would be a felony or an offense of violence if committed by an adult.  R.C. 2923.41(B)(1)(a)-(b).  A person acts purposely "when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."  R.C. 2901.22(A).

{¶ 163} With respect to Onaje's active participation in the Real Shooters, Sergeant Johnson and Harrigan — officers who specialize in identifying gang activity — identified more than 25 social media postings from January 2019 through July 2019, in which Onaje — often with the other defendants or other known members of the Real Shooters — is seen displaying hand signs for the Real Shooters and/or Heartless Felons, is seen holding one or more firearms and/or is commenting on social media posts by other Real Shooters.  Sergeant Johnson testified that gangs "boast" "back and forth" on social media by displaying their access to guns.  A number of such social media postings by or involving Onaje were viewed on social media on January 29, 2019 — the date of the third shooting incident.

{¶ 164} The state also presented evidence that Onaje regularly "hung out" with other Real Shooters members, that Onaje used multiple Instagram accounts with "rs" in the username and that, on multiple occasions, Onaje had worn a hoodie with the words "President R.S." airbrushed on the front and the words "Buckeye Road 116" and images of broken hearts — numbers and symbols associated with the Real Shooters and/or Heartless Felons — airbrushed on the back. In addition, the state presented evidence that two or more Real Shooters members were involved in each of the shootings on December 4, 2018, January 27, 2019 and January 29, 2019, that the shootings occurred while Onaje was a member of the Real Shooters, and that Onaje was present for and/or had a role in the shootings, either as the driver of the vehicle or as a shooter.

{¶ 165} The evidence presented at trial in support of Onaje's participation in the Real Shooters was at least as substantial as that presented in support of Nasim's participation in the Real Shooters, which this court previously held was sufficient to support Nasim's conviction for participating in a criminal gang in violation of R.C. 2923.42(A). *See Nicholson*, 2022-Ohio-374, at ¶ 17-33. Further, unlike Nasim, the jury found Onaje guilty of multiple felony offenses in connection with the January 29, 2019 shooting. Based on this evidence, the state met its burden. The state's evidence, if believed, was sufficient to prove each element necessary to convict Onaje of participating in a criminal gang. Accordingly, the trial court did not err in denying Onaje's Crim.R. 29(A) motion as to Count 1.

### 3. Failure-to-Comply Charges

{¶ 166} Finally, Onaje argues that there was insufficient evidence to convict him of any of the three counts of failure to comply in violation of R.C. 2921.331(B) — Count 26 (on February 21, 2019), Count 27 (on February 26, 2019) and Count 28 (on March 13, 2019). We address each of these counts in turn.

{¶ 167} R.C. 2921.331(B) states: "No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." With respect to the February 21, 2019 incident, Onaje contends that there was insufficient evidence to convict him of failure to comply because (1) when Sergeant Johnson saw Onaje at the gas station, Sergeant Johnson was in plain clothes and an unmarked vehicle, (2) Sergeant Johnson never gave any verbal commands to Onaje, (3) Sergeant Johnson activated the lights on his vehicle only after Onaje got into the Volvo and drove away and (4) police did not pursue Onaje. We disagree.

{¶ 168} Sergeant Johnson testified that after Onaje parked the Volvo and went into the gas station, he pulled his vehicle in front of the Volvo, in an attempt to block the Volvo, and activated his vehicle's lights. He stated that when Onaje returned to the vehicle, he ignored the lights, maneuvered his vehicle around Sergeant Johnson's vehicle and took off into traffic, heading northbound on Lee Road. Sergeant Johnson testified that he was "[a]bsolutely" certain that Onaje was the person he had seen getting into the silver Volvo. Harrigan stated that he did not see the face of the Volvo's driver and, therefore, could not identify him, but similarly

testified that the lights had been activated on Sergeant Johnson's vehicle *before* the Volvo pulled out of the gas station. Harrigan further testified that the lights had been activated on another police vehicle that pulled into the gas station behind the Volvo as the driver was getting into the Volvo.

{¶ 169} The fact that police officers did not verbally order Onaje to stop and were unable to safely pursue the Volvo due to heavy traffic and Onaje's violation of traffic control laws did not preclude his conviction on Count 26. *See, e.g., State v. Sims*, 8th Dist. Cuyahoga No. 89261, 2007-Ohio-6821, ¶ 28 ("'A plain reading of [R.C. 2921.331(B)] shows that a signal from an officer need not be verbal; the blue lights and siren qualify as an applicable signal to stop.'"), quoting *State v. Wooden*, 86 Ohio App.3d 23, 26, 619 N.E.2d 1132 (9th Dist.).

{¶ 170} Viewing the evidence in the light most favorable to the state, a rational trier of fact could conclude, based on the officers' testimony, that Onaje operated his vehicle to willfully elude the police after receiving a visible or audible signal to stop. Accordingly, the state's evidence was sufficient to support Onaje's conviction for failure to comply in violation of R.C. 2921.331(B) on Count 26.

{¶ 171} With respect to the February 26, 2019 incident, Onaje asserts that there was insufficient evidence to support his conviction for failure to comply because the evidence presented by the state "failed to establish that Onaje was even in the subject vehicle on February 26, 2019." We agree. Sergeant Johnson, who was watching the Nicholsons' residence from a Wal-Mart parking lot approximately eight houses away, repeatedly testified that he was not sure if the male he had seen

getting into the silver Volvo was Onaje. No one else identified the male seen as Onaje. Although the presence of the black and purple RS hoodie — which Onaje had previously worn in multiple photographs posted on social media — in the back seat of the vehicle could reasonably support the inference that Onaje had at one time been in that vehicle, it could not reasonably support the inference that Onaje was in the vehicle on February 26, 2019, when the vehicle was being pursued by, and failing to comply, with police signals to stop. Accordingly, we vacate Onaje's conviction on Count 27.

{¶ 172} With respect to the March 13, 2019 incident, Onaje does not explain why he contends there was insufficient evidence to support his conviction for failure to comply. In his brief, he simply notes that "police were on an unrelated surveillance * * * when they recognized a pickup truck belonging to Erica Booker," that "[t]hey saw Onaje walking to the [pickup] and police attempted to stop him" and that "[t]he vehicle evaded police" and then asserts "[t]he court should have dismissed this count for insufficient evidence."

{¶ 173} Sergeant Johnson testified that on March 13, 2019, he saw Onaje walking towards the pickup truck from the gas station. He stated that he was familiar with what Onaje looked like and that there was no "mistaking" that the individual he saw was Onaje. Sergeant Johnson testified that he followed the pickup truck after it left the gas station until it turned into a driveway and that he then turned on his lights and attempted to "box" the pickup truck "into the driveway." Harrigan testified that his vehicle was behind Sergeant Johnson's vehicle when the

pickup truck pulled out of the gas station, that he followed Sergeant Johnson's vehicle (and the pickup) to the driveway and that he also then activated his lights and sirens in an attempt to apprehend Onaje. The officers testified that Onaje ignored the lights and sirens, that he drove the pickup truck around Sergeant Johnson's vehicle down the sidewalk and onto the street and that the pickup truck was thereafter pursued by police until, due to the pickup truck's excessive speed and failure to comply with traffic control signals, police ultimately lost sight of the vehicle. Sergeant Johnson's and Harrigan's testimony was sufficient to support a conviction for failure to comply in violation of R.C. 2921.331(B) on Count 28.

{¶ 174} Accordingly, we sustain Onaje's sixth assignment of error in part and overrule it in part.

### F. Manifest Weight of the Evidence

{¶ 175} In his seventh assignment of error, Onaje asserts that all of his convictions should be reversed because they are against the manifest weight of the evidence.

{¶ 176} In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, 678

N.E.2d 541, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 177} Following a thorough review of the record, weighing the strength and credibility of the evidence presented and the reasonable inferences to be drawn therefrom, we cannot say that this is one of those "'exceptional cases'" in which the trier of fact clearly lost its way and created a manifest miscarriage of justice that the defendant's convictions must be reversed. *Thompkins* at 387, quoting *Martin* at 175.

{¶ 178} As an initial matter, we note that although Onaje asserts that all of his convictions are against the manifest weight of the evidence, his appellate brief contains no manifest weight argument with respect to his convictions on the failure-to-comply counts other than with respect to his conviction on Count 27, which we have already vacated above. Accordingly, we disregard Onaje's assignment of error to the extent it relates to those counts. App.R. 12(A)(2).

## 1. Offenses Related to the January 29, 2019 Shooting

{¶ 179} With respect to the remaining counts of which he was convicted, Onaje contends that his convictions relating to the January 29, 2019 shooting were against the manifest weight of the evidence because (1) Sanders was "totally unreliable" and "self-interested" and (2) Brooks' testimony "lack[ed] credibility" given that she had admitted to deleting Instagram messages she sent to others, had admitted to using her brother's Instagram account to send those messages and had admitted to lying in a Facebook post regarding the incident. Onaje further argues that his convictions relating to the January 29, 2019 shooting should be overturned on manifest-weight grounds because "[n]o one placed Onaje at the shooting scenes except Sanders," the Instagram photos are "not probative of establishing guilt of any of the alleged shooting incidents" and there was "no evidence" Onaje had "any intention or reason to kill, or inflict serious physical harm upon any of the victims named in the felonious assaults."

{¶ 180} As stated above, a conviction may rest solely on the testimony of a single witness, if believed, and there is no requirement that a witness' testimony be corroborated to be believed. *See, e.g., Flores-Santiago*, 2020-Ohio-1274, at ¶ 38; *State v. Black,* 8th Dist. Cuyahoga No. 108001, 2019-Ohio-4977, ¶ 43; *State v. Schroeder,* 4th Dist. Adams No. 18CA1077, 2019-Ohio-4136, ¶ 84. Although we consider credibility when reviewing a challenge to a conviction based on the manifest weight of the evidence, we recognize that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of

fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 181} A jury is free to believe all, some or none of the testimony of each witness testifying at trial. *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 85; *State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 100. A conviction is not against the manifest weight of the evidence "solely because the jury heard inconsistent or contradictory testimony." *State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 72, citing *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38; *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 45 (8th Dist.) ("A defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory."); *see also State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 7 (May 28, 1996). Likewise, a defendant is not entitled to reversal on manifest weight grounds simply because a witness may be "biased," may have been motivated by self-interest in testifying or may have previously lied. *See, e.g., State v. Abdul-Hagg*, 8th Dist. Cuyahoga No. 103974, 2016-Ohio-7888, ¶ 33-37, citing *State v. Holloway*, 8th Dist. Cuyahoga No. 101289, 2015-Ohio-1015,

¶ 18, 39-44; *State v. Perales*, 5th Dist. Delaware No. 06-CA-A-12-0093, 2008-Ohio-58, ¶ 22-27, 40, 132-135.

{¶ 182} The jury heard all of Sanders' and Brooks' testimony regarding the events surrounding the shootings and was free to determine their credibility. Defense counsel thoroughly cross-examined Sanders regarding his versions of the events — pointing out potential inconsistencies between his prior statements and his trial testimony and inconsistencies between his testimony and the testimony of other witnesses — and highlighted Sanders' ulterior motive for testifying against Onaje and Nasim in the case based on his plea deal. Likewise, defense counsel thoroughly cross-examined Brooks regarding her use of her brother's Instagram account, her motivation in testifying against Onaje and her prior, untruthful statement on social media that one of her children had been grazed by a bullet following the January 29, 2019 shooting. Onaje has not shown that Sanders' and Brooks' testimony was so inherently incredible as to preclude a reasonable jury from believing any of it. Further, Sanders' and Brooks' testimony regarding Onaje's role in the January 29, 2019 shooting was corroborated — in part — by Onaje's responses to the text messages he received from Sanders after the shooting regarding the alleged injury to a baby.

{¶ 183} Onaje's argument that there was "no evidence" he had "any intention or reason to kill, or inflict serious physical harm upon any of the victims named in the felonious assaults" is likewise meritless. As detailed above, the state presented ample evidence from which the jury could have reasonably found beyond

a reasonable doubt that Onaje was one of the shooters involved in the January 29, 2019 shooting. Although proof of motive or "reason" for harming another is not required for a felonious assault conviction, *see, e.g., State v. Williams*, 5th Dist. Stark No. 2019CA00188, 2021-Ohio-443, ¶ 26, Brooks testified regarding an existing "beef" between Onaje, her brother and others related to a prior shooting. She further testified that Onaje had been threatening her and had posted her address on social media shortly before the shooting.

{¶ 184} To convict Onaje of felonious assault, the state needed to prove that Onaje "knowingly * * * [c]ause[d] or attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). A defendant's knowledge may be inferred from the totality of the surrounding circumstances. *See, e.g., State v. Sharp*, 8th Dist. Cuyahoga No. 103445, 2016-Ohio-2634, ¶ 25, citing *State v. Smith*, 8th Dist. Cuyahoga No. 96348, 2011-Ohio-6466, ¶ 51.

{¶ 185} Sanders testified that on the morning of the shooting, Onaje drove Sanders' vehicle from Onaje's house in South Euclid to a house on Cato Street in Maple Heights, identifying it as "Yelly's house." The shooting occurred in a residential neighborhood, at approximately 5:00 a.m., when most people are at home sleeping. During the shooting, more than 30 rounds were shot at and into the residence in which Brooks, her brother and Brooks' three young children were known to live. Based on these facts, the jury could have reasonably inferred that Onaje "knowingly" "attempt[ed] to cause physical harm to another * * * by means of

a deadly weapon," i.e., that Onaje was "aware" that his conduct "will probably cause a certain result," to support his felonious assault convictions. *See* R.C. 2903.11(A)(2); 2901.22(B).

### 2. Participating in a Criminal Gang

{¶ 186} Onaje contends that his conviction for participating in a criminal gang was against the manifest weight of the evidence because (1) the evidence of the existence of a Real Shooters gang was "extremely weak," (2) Harrigan "lacked any real experience in Cleveland gangs," (3) "screenshots of individuals with guns from unverified Instagram accounts did not establish the existence of a criminal gang" because third parties can use and establish accounts in other people's names and (4) there was "nothing to indicate there was an organization of its alleged members to commit criminal acts." This court previously considered and rejected similar arguments in *Nicholson*, 2022-Ohio-374, in concluding that Nasim's conviction for participating in a criminal gang was not against the manifest weight of the evidence. *See Nicholson* at ¶ 43-50. The same conclusion is warranted here.

{¶ 187} With respect to Harrigan's experience, Harrigan testified that, at the time of trial, he had been a police officer with the Cleveland Police Department for approximately seven years. He stated that he had graduated from the Cleveland Police Academy, received on-the-job training, investigated numerous types of crimes in the Cleveland area and attended various ongoing training courses related to his work as a police officer. Harrigan stated that he started out as a patrol officer and was later transferred to the Neighborhood Impact Community Engagement

("NICE") unit, where he became a detective. In the mid-to-late 2018, while he was working in the NICE unit, he was detailed to the gang impact unit, where he was trained by, and began working under the supervision of, Sergeant Johnson. Harrigan testified that he had been involved in multiple different gang investigations in Cleveland and had been qualified four times in juvenile court as an expert on gang activities.

{¶ 188} Further, Harrigan was not the only witness who testified at trial regarding the Real Shooters. Sergeant Johnson also testified at length regarding his investigation of the Real Shooters.[15] The jury heard the testimony of Sergeant Johnson and Harrigan regarding their experience investigating gangs, their investigation of the Real Shooters, the numerous social media postings they examined and the factors they considered in determining that the Real Shooters was a criminal gang that operated in the area of East 116th Street between Kinsman Road and Buckeye Road and that Onaje was an active member of that gang. Harrigan and Sergeant Johnson were thoroughly cross-examined at trial by defense counsel regarding their investigation. The jury was free to believe or disbelieve all or part of their testimony.

{¶ 189} Having carefully reviewed the evidence, we cannot say that the jury lost its way in resolving any conflicts in the evidence and created such a manifest miscarriage of justice that Onaje's convictions on Counts 1, 14, 16-26 or 28 must be

---

[15] As noted above, Onaje has not challenged the expertise of Sergeant Johnson as it relates to the investigation and identification of Cleveland criminal gangs.

reversed and a new trial ordered.  Accordingly, Onaje's seventh assignment of error is overruled.

## G.  Reverse Bindover — Amenability Hearing

{¶ 190} In his second assignment of error, Onaje argues that the juvenile court abused its discretion in determining that Onaje was not amenable to care or rehabilitation within the juvenile justice system and transferring jurisdiction of the case back to the general division for the invocation of his sentences.

{¶ 191} Juveniles bound over to the general division through mandatory transfer may, in certain circumstances, return to the juvenile justice system through a reverse bindover.  R.C. 2152.121.  In this case, because Onaje was acquitted of the attempted murder charges that required a mandatory transfer of the case from the juvenile division to the general division but was found guilty of other offenses that would have allowed for discretionary transfer of the case from the juvenile division to the general division, *see* R.C. 2152.10(B), the "reverse-bindover procedure set forth in R.C. 2152.121(B)(3) was activated," i.e., the general division sentenced Onaje on each of the offenses of which the jury found him guilty, stayed the sentences and remanded the case back to the juvenile court for further proceedings.  *See State v. Mobley*, 8th Dist. Cuyahoga No. 106765, 2018-Ohio-4793, ¶ 19; *see also State v. D.B.*, 150 Ohio St.3d 452, 2017-Ohio-6952, 82 N.E.3d 1162, ¶ 13 (noting that the reverse-bindover procedure in R.C. 2152.121(B)(3) "is required if the crimes for which convictions were obtained, had they been delinquency charges, would have

subjected the juvenile's case only to discretionary, rather than mandatory, transfer proceedings").

{¶ 192} R.C. 2152.121(B)(3) provides, in relevant part:

If a complaint is filed against a child alleging that the child is a delinquent child, if the case is transferred pursuant to division (A)(1)(a)(i) or (A)(1)(b)(ii) of section 2152.12 of the Revised Code, and if the child subsequently is convicted of or pleads guilty to an offense in that case, the sentence to be imposed or disposition to be made of the child shall be determined as follows:

* * *

(3) If the court in which the child is convicted of or pleads guilty to the offense determines under division (B)(1) of this section that, had a complaint been filed in juvenile court alleging that the child was a delinquent child for committing an act that would be that offense if committed by an adult, division (A) of section 2152.12 of the Revised Code would not have required mandatory transfer of the case but division (B) of that section would have allowed discretionary transfer of the case, the court shall determine the sentence it believes should be imposed upon the child under Chapter 2929. of the Revised Code, shall impose that sentence upon the child, and shall stay that sentence pending completion of the procedures specified in this division. Upon imposition and staying of the sentence, the court shall transfer jurisdiction of the case back to the juvenile court that initially transferred the case and the juvenile court shall proceed in accordance with this division. * * * Upon transfer of jurisdiction of the case back to the juvenile court, both of the following apply:

(a) Except as otherwise provided in division (B)(3)(b) of this section, the juvenile court shall impose a serious youthful offender dispositional sentence upon the child under division (D)(1) of section 2152.13 of the Revised Code. * * *

(b) Within fourteen days after the filing of the journal entry regarding the transfer, the prosecuting attorney in the case may file a motion in the juvenile court that objects to the imposition of a serious youthful offender dispositional sentence upon the child and requests that the sentence imposed upon the child by the court in which the child was convicted of or pleaded guilty to

the offense be invoked. Upon the filing of a motion under this division, the juvenile court shall hold a hearing to determine whether the child is not amenable to care or rehabilitation within the juvenile system and whether the safety of the community may require that the child be subject solely to adult sanctions. If the juvenile court at the hearing finds that the child is not amenable to care or rehabilitation within the juvenile system or that the safety of the community may require that the child be subject solely to adult sanctions, the court shall grant the motion. Absent such a finding, the juvenile court shall deny the motion. In making its decision under this division, the juvenile court shall consider the factors listed in division (D) of section 2152.12 of the Revised Code as factors indicating that the motion should be granted, shall consider the factors listed in division (E) of that section as factors indicating that the motion should not be granted, and shall consider whether the applicable factors listed in division (D) of that section outweigh the applicable factors listed in division (E) of that section.

If the juvenile court grants the motion of the prosecuting attorney under this division, the juvenile court shall transfer jurisdiction of the case back to the court in which the child was convicted of or pleaded guilty to the offense, and the sentence imposed by that court shall be invoked. If the juvenile court denies the motion of the prosecuting attorney under this section, the juvenile court shall impose a serious youthful offender dispositional sentence upon the child in accordance with division (B)(3)(a) of this section.

{¶ 193} In this case, after the case was remanded back to the juvenile court, the state filed a timely notice of objection to the imposition of a serious youthful offender dispositional sentence upon Onaje and requested that the juvenile court conduct an amenability hearing pursuant to R.C. 2152.121(B)(3). Onaje was referred for a psychological evaluation by the Cuyahoga County Juvenile Court Diagnostic Clinic.

{¶ 194} On April 16, 2021, the juvenile court conducted an amenability hearing. Ciara Ware, Onaje's probation officer, testified at the hearing. The parties stipulated to the admissibility and authenticity of the psychological evaluation report prepared by Dr. Lynn Williams, a forensic psychologist with the Cuyahoga County Juvenile Court Diagnostic Clinic, dated March 4, 2021.

{¶ 195} Ware was assigned to Onaje's case on October 1, 2020. She stated that Onaje had just turned 19 and that he had completed sufficient credits to be in the 11th grade. Based on her review of Onaje's case records, Ware testified regarding Onaje's prior involvement with the juvenile justice system. The parties stipulated that Onaje had successfully completed probation on burglary charges in 2014 and a carrying concealed weapon charge in 2018, including completion of a gun prevention program.

{¶ 196} Ware testified that, in December 2018, while Onaje was on probation and enrolled in the gun prevention program, he was charged in an aggravated robbery case for which he was later bound over to the general division. In April 2019, Onaje was charged in another case in which he was ultimately adjudicated delinquent of obstructing official business and criminal trespassing. In June 2019, Onaje was charged in this case, and in 2020, Onaje was charged with assault on a corrections officer, a fifth-degree felony, to which he pled to an amended charge of assault, a first-degree misdemeanor.

{¶ 197} Ware testified that a youth, such as Onaje, who had a substance abuse history, mental health issues, prior criminal history and education issues

could receive services through probation or the Ohio Department of Youth Services but that the efficacy of such services "would depend on the individual."

{¶ 198} In her report, Dr. Williams noted that Onaje is an 11th grade student, who had earned a majority of the credits necessary for a high school diploma and that he had no intellectual deficiency. She reported that Onaje had exhibited significant behavioral problems in school, including a history of suspensions for fighting and truancy, had an "extensive history of anger management issues" and had endured several significant traumatic events, including witnessing the murder of his older half-brother and experiencing the deaths of several other family members. She indicated that Onaje qualified for special education services due to his disruptive behaviors.

{¶ 199} Dr. Williams stated that Onaje admitted using alcohol approximately once a week and marijuana daily. She indicated the Onaje had been previously diagnosed with attention deficit/hyperactivity disorder (but that no symptoms were currently noted), oppositional defiant disorder, generalized anxiety disorder, problems related to education and literacy and other specified problems related to psychosocial circumstances. She indicated that Onaje's current diagnoses were unspecified trauma- and stressor-related disorder, adjustment disorder with depression, conduct disorder and "cannabis use disorder, severe, in early remission in a controlled environment." She stated that it did not appear that Onaje was suffering from a mood disorder or major mental disorder affecting his ability to perceive reality.

{¶ 200} Dr. Williams also discussed Onaje's criminal history and stated that the assessment of risk factors that may contribute to future antisocial or violent acts was in the middle- or high-offender range. She stated that Onaje's "prior court involvements and problematic behaviors would support a repetitive and persistent pattern of behavior in which the basic rights of others and major age-appropriate societal norms or rules are violated."

{¶ 201} At the conclusion of her report, Dr. Williams set forth the following findings:

> Should the facts support Onaje's involvement in the acts with which he has been charged, the following factors should be regarded as indicators that he <u>would</u> be responsive to care and rehabilitative services available through the Juvenile Justice System:
>
> - Onaje has successfully completed requirements related to probation one time. Onaje reportedly successfully completed the Gun Intervention program and most of his community service hours for his second time on probation.
> - Onaje demonstrated an understanding of victim empathy and articulated some responsibility for his behavioral problems.
> - Onaje has had some positive engagement in a behavioral health intervention (Family Solutions of Ohio, Inc.)
> - Onaje has an understanding of behavioral norms and the rules and laws of society.
> - Onaje can identify alternative actions to illegal activities.
>
> Should the facts support Onaje's involvement in the acts with which he has been charged, the following factors should be regarded as indicators that he <u>would not</u> be responsive to care and rehabilitative services available through the Juvenile Justice System:
>
> - Although Onaje has had some positive participation in behavioral health intervention, he appeared to have some decline in therapeutic gains made around the time of the current offenses.

- Onaje has a history of poor self-regulation and physical aggression (i.e., fighting at school).
- Onaje has a history of possession of a firearm and was previously adjudicated on a Carrying Concealed Weapons charge (DL18106753). Current police records indicated that Onaje was carrying and using a weapon.
- Onaje has had two previous court involvements. Onaje's pattern of poor decision-making is precipitated by negative community associations (some of which may have gang affiliation), and poor emotional regulation.
- Onaje's previous * * * and current charges involved co-delinquents and police records indicated that he has negative associations, which are possibly gang affiliated.
- Onaje has an understanding of behavioral norms and the rules and laws of society; however, despite this understanding he has engaged in criminal activity.
- [In] the pending case, twenty-four of the thirty-one charges have one-[,] three- and five-year firearm specifications.
- There is not sufficient time to rehabilitate Onaje within the Juvenile Justice System. Onaje is 18 years, 10 months old and the Juvenile Justice System can retain jurisdiction until the age of 21.

{¶ 202} Onaje did not present any witness testimony at the amenability hearing. After considering all of the information collected in the court's investigation, the evidence presented at the hearing and the factors set forth in R.C. 2152.12(D) and (E), the juvenile court found that Onaje was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions.

{¶ 203} In its April 26, 2021 journal entry, the juvenile court set forth its findings as follows:

> The Court finds after a full investigation, including a mental examination of said child made by a duly qualified person, and after full consideration of the child's prior juvenile record, family environment, school record, efforts previously made to treat and rehabilitate the

child, including prior commitments to the Department of Youth Services, the nature and severity of the offense herein, the age, physical, and mental condition of the victim as effected by the matter herein, and other matters of evidence, that there are reasonable grounds to believe that the child herein is not amenable to care or rehabilitation within the juvenile system.

The Court considered the relevant factors in favor of transfer pursuant to R.C. 2152.12(D) and makes the following findings:

(4) The child allegedly committed the act charged for hire or as part of a gang or other organized criminal activity, with one and three year firearm specifications.
(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.
(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.
(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.
(8) The child is emotionally, physically, or psychologically mature enough for the transfer.
(9) There is not sufficient time to rehabilitate the child within the juvenile system.

The Court considered the relevant factors against transfer pursuant to R.C. 21152.12(E) and finds that none of these factors apply.

The Court further finds that the safety of the community may require that he be held beyond his twenty first birthday. The General Division imposed a prison sentence in this matter for a total term of 21 years to 25 years pursuant to the Reagan Tokes Act on both the three year firearm specification and the underlying felony offenses.

{¶ 204} We review a juvenile court's amenability determination for abuse of

discretion. *See, e.g., State v. Crosby*, Nos. 107392 and 107551, 2019-Ohio-2217,

¶ 28, citing *State v. Jones*, 8th Dist. Cuyahoga No. 99044, 2013-Ohio-3725, ¶ 9, and *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629. A trial court abuses its discretion where its decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 205} Onaje argues that the juvenile court "abused its discretion by ordering a transfer" when the evidence presented at the amenability hearing "supported a finding that [Onaje] was actually amenable to care or rehabilitation in the juvenile system." Specifically, Onaje argues that the juvenile court "erred in assessing the applicability of the E factors" — noting that Dr. Williams had made several findings in her report that Onaje would be responsive to rehabilitative services in the juvenile justice system — and failed to give due consideration to the defense's argument that Onaje should be given an opportunity to be rehabilitated because, if he failed to complete services, he would be subject to a substantial serious youthful offender sentence. We disagree.

{¶ 206} The record reflects that the juvenile court considered and weighed the relevant R.C. 2152.12(D) and (E) factors in determining that Onaje was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions. "[G]iven the discretion afforded the juvenile court by the legislature in determining a juvenile's amenability to the juvenile justice system, "'[i]f there is some rational and factual basis to support the trial court's decision, we are duty bound to affirm it regardless

of our personal views of the evidence.'" *Crosby* at ¶ 28, quoting *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 10 (4th Dist.); *see also State v. Hughley*, 8th Dist. Cuyahoga No. 108771, 2020-Ohio-4741, ¶ 23 (reviewing court is bound to affirm bindover decision where juvenile court weighs the statutory factors and there is a rational basis for its findings relating to those factors).

{¶ 207} The record reflects that Onaje had a significant history of criminal conduct and that Onaje's crimes were escalating, were gang-related, involved the use of firearms and were committed while Onaje was already on probation for other offenses. A rational, factual basis existed for the juvenile court's findings with respect to the factors in R.C. 2152.12(D) and (E) and its ultimate determination that Onaje was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions. Accordingly, the juvenile court did not abuse its discretion in determining that Onaje was not amenable to care or rehabilitation within the juvenile system and in transferring the case back to the general division for invocation of the previously imposed sentences. Onaje's second assignment of error is overruled.

### H. Challenge to Sentences

{¶ 208} In his eighth and final assignment of error, Onaje contends that the trial court erred in sentencing him on Count 1 under the Reagan Tokes Law, which became effective March 22, 2019. Under the Reagan Tokes Law, qualifying first- and second-degree felonies committed on or after March 22, 2019 are subject to the imposition of indefinite sentences. Onaje argues that the Reagan Tokes Law is

unconstitutional because it violates his constitutional rights to trial by a jury, separation of powers and due process.

{¶ 209} "[T]he question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court." *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986). The record reflects that Onaje did not raise a constitutional challenge to the Reagan Tokes Law in the trial court. His failure to do so forfeits the argument. *See, e.g., State v. Debose,* 8th Dist. Cuyahoga No. 109531, 2022-Ohio-837, ¶ 14-17 (noting that "[t]his court has repeatedly declined to address constitutional challenges to the Reagan Tokes Law" where, as here, the defendant "(1) did not challenge the constitutionality of the law below and/or (2) failed to present a plain error argument on appeal"); *Nicholson*, 2022-Ohio-374, at ¶ 61-62. Accordingly, we decline to address Onaje's constitutional challenges to the Reagan Tokes Law.

{¶ 210} Furthermore, even if we were to consider the issue, we would find no plain error here. The arguments presented in this case do not present novel issues or any new theory challenging the constitutional validity of any aspect of the Reagan Tokes Law left unaddressed by this court's en banc decision in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.).

{¶ 211} Onaje also argues that the trial court erred in applying the Reagan Tokes Law when sentencing him on Count 1 because "[w]hile [C]ount 1 carried an offense range of August 1, 2018 to June 19, 2019, Onaje was convicted of underlying offenses that occurred at the latest on March 13, 2019" and "there is no evidence of

when any of the social media photos were taken or posted." Onaje's counsel raised this issue at the sentencing hearing.

{¶ 212} This court previously considered a nearly identical argument raised by Nasim in *Nicholson*, 2022-Ohio-374, and rejected it as meritless:

> Nasim * * * contends that the Reagan Tokes Law should not be applied to him because the dates of the three shootings for which he was charged and which he contends "the state relied upon as foundational for the gang charge," all preceded March 22, 2019, the effective date of the law. * * * We find it has no merit * * *. The date range for the conduct in Count 1, participating in a criminal gang, for which Nasim was found guilty, was between August 21, 2018, and June 19, 2019, which obviously includes a time period after the Reagan Tokes Law became effective. * * * [T]he fact that Nasim was not guilty of the three shooting incidents is not determinative of his guilt on Count 1. Because Nasim was found guilty of conduct encompassed by the Reagan Tokes Law, the trial court did not err in sentencing him under the law.

*Id*. at ¶ 63-64. As with Nasim, the date range for the conduct in Count 1, participating in a criminal gang, for which Onaje was found guilty, was between August 21, 2018, and June 19, 2019, which includes a time period after the Reagan Tokes Law became effective. The state presented evidence of photographs and social media postings demonstrating that the Real Shooters continued to exist as a criminal gang and that Onaje continued to participate as an active member of the Real Shooters after March 22, 2019. Following *Nicholson*, because Onaje "was found guilty of conduct encompassed by the Reagan Tokes Law, the trial court did not err in sentencing him under the law." *Id*. at ¶ 64.

{¶ 213} Accordingly, we overrule Onaje's eighth assignment of error.

{¶ 214} Judgment affirmed in part, vacated in part, and remanded. Conviction on Count 27 having been vacated, the case is remanded for the issuance of a revised sentencing journal entry reflecting that the conviction on Count 27 has been vacated.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR